GINSBURG, FELDMAN & BRESS,
Appellant,

v.

FEDERAL ENERGY
ADMINISTRATION.

No. 76–1759.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 27, 1977.

Decided Feb. 14, 1978.

Rehearing En Banc Granted; Judgment
and Opinion of Feb. 14, 1978, vacated.

Reheard En Banc April 6, 1978.

As Amended April 13, 1978.

On Rehearing En Banc, 591 F.2d 752.

James Hamilton, Washington, D. C., with
whom David Ginsburg and Fred W. Drogu-
la, Washington, D. C., were on the brief, for
appellant.

Michael Kimmel, Atty., Dept. of Justice,
Washington, D. C., for appellee. Rex E.
Lee, Asst. Atty. Gen., Earl J. Silbert, U. S.
Atty., Leonard Schaitman and John K. Vil-
la, Attys., Dept. of Justice, Washington, D.
C., were on the brief, for appellee.

Before MacKINNON, ROBB and WIL-
KEY, Circuit Judges.

Opinion for the court filed by MacKIN-
NON, Circuit Judge.

Dissenting opinion filed by WILKEY,
Circuit Judge.

MacKINNON, Circuit Judge:

A partnership of lawyers that represents
various clients before the Federal Energy
Administration (FEA and the "Agency")
brought this suit in the District Court under
the Freedom of Information Act, 5 U.S.C.
§ 552(a)(4)(B). They request access to cer-
tain Agency guidelines and instructions
contained in a manual and to various mem-
oranda issued to employees who audit oil
refineries regulated by the FEA. A prior
request for the same matter had been de-
nied by the Agency. The District Court
granted the request in part and denied the
remainder. We agree generally with the
court's disposition and accordingly affirm
its judgment with slight modification.

## I. APPELLANTS' REQUEST

The FEA is charged with administering
the Federal Mandatory Petroleum Price
Regulations and various federal laws and
regulations relating to the refining of pe-
troleum products. Industry compliance is
monitored through periodic audits, and ap-
pellants seek to require the FEA to provide
them access to the Agency's Guidelines and
instructions to these employees. Specifical-
ly appellants request access to

> any and all manuals, instructions, mem-
> oranda, guidelines, training materials, re-
> porters, booklets, and other documents
> utilized by FEA to train, instruct, direct,
> guide, or supervise refinery auditors in
> the performance of their duties, includ-
> ing, but not limited to, the manner in
> which such audits are to be conducted
> and the time frame, if any, within
> (which) such audits are to be completed.

(J.A. 5).

Appellants were unable to state with any
more specificity the exact documents they
desired to inspect, but the written material
which evolved as the target of their general
request turned out to be:

> (a) an FEA instruction manual for re-
> finery auditors entitled "Basic Refiner
> Course" and (b) FEA's "Refinery Audit
> Review Field Audit Guidelines" (as sup-
> plemented on February 28, 1975, by the
> FEA's "Guidelines for Audit Modules")
> [hereafter, "Guidelines"]. . . .

(J.A. 5, 9). Both the Agency and the trial
court decided that the "Basic Refiner
Course" manual was *not* exempt from dis-
closure. Hence this opinion is concerned
solely with the Guidelines.

## II. APPELLANTS' THEORIES

Appellants base their claim on two legal theories. First, they contend that the Guidelines are subject to disclosure because they "constitute an 'administrative staff manua[l] and instructions to staff that affect a member of the public' such as [are] referred to in 5 U.S.C. 552(a)(2)(C)." (J.A. 6). Second, as an alternative theory, appellants claim that FEA's refusal to produce the Guidelines violated 5 U.S.C. § 552(a)(3),[1] which requires agencies to make most records promptly available to any person whose request for them conforms to published rules and reasonably describes the records requested (J.A. 6).

## III. THE ADMINISTRATIVE STAFF MANUAL THEORY

Appellants' first and principal contention is that the Guidelines are an "administrative staff manual" that the statute requires to be disclosed. The relevant statute provides:

(a) Each agency shall make available to the public information as follows:

\*   \*   \*   \*   \*   \*

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

\*   \*   \*   \*   \*   \*

(C) *administrative* staff manuals and instructions to staff that affect a member of the public; unless the materials are promptly published and copies offered for sale. . . .[2] A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

5 U.S.C. § 552(a)(2)(C) (Supp. V 1975) (emphasis added).

When enacting this statute, Congress made it clear that it distinguished between manuals relating to "law enforcement matters" and manuals relating to "administrative matters," and that it did not intend to require disclosure of the former.[3] The Sen-

---

1. *See* text of statute at p. —— of 192 U.S.App. D.C., at p. 721 of 591 F.2d.

2. The following sentence indicates this section is addressed to the problem of agencies' "secret law." *See* Text at —— of 192 U.S.App.D.C., at 718 of 591 F.2d *infra.*

3. Appellants admitted that "law enforcement material whose disclosure would significantly impede detection or prosecution of law violators" is not required to be dislosed" (J.A. 14). The FEA decision stated that "the materials [Guidelines] specify various methods of investigating the accuracy of the data contained in reports which refiners are required to submit to the FEA in support of the propriety of prices charged for covered products . . . under the FEA Mandatory Petroleum Price Regulations" (J.A. 17). This is obviously an instruction *relating to law enforcement.* In its Statement of Material Facts as to which there is no genuine issue, the agency described the Guidelines and their use by the FEA Office of Compliance; the specific statement is made that, "the contents of the Guidelines show how to test for compliance, not how to achieve compliance" and "Nothing in the Guidelines explains or interprets the regulations or sets forth legal

standards not otherwise published" (J.A. 34, 35). Appellants, not having examined the document, did not agree with the agency's Statement (J.A. 36), but the trial court had the Guidelines before it and made an *in camera* inspection. Its judgment found part to be exempt and required part to be disclosed:

[I]t appears to the court that the FEA "Refinery Audit Review Guidelines" and "Guidelines for Audit Modules" describe investigatory strategy and, to that extent, are exempt from the Freedom of Information Act pursuant to 5 U.S.C. § 552(b)(2), and it further appears that portions of the Guidelines express interpretations of applicable regulations and must be disclosed. Therefore, it is, by the court . . . . .

\*   \*   \*   \*   \*   \*

ORDERED, ADJUDGED and DECREED that defendant *disclose to plaintiff, within 15 days* of the entry of this Judgment, the following:
1. Field Audit Guidelines
a. II–A–4, General Audit Step (7), except that the first two sentences may be withheld.
b. II–C–1, General Audit Step (2).
c. II–C–1, General Audit Step (3), except that subparagraph 3(b) may be withheld.
d. II–C–1, General Audit Step (10).

ate Committee Report on this section of the bill repeats the statutory language that "administrative staff manuals and instructions to staff that affect a member of the public" are to be made available, but elsewhere specifically excludes "law enforcement matters" from the disclosure requirement for "administrative matters":

> The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to administrative matters *rather than to law enforcement matters* protects the traditional confidential nature of instructions to Government personnel prosecuting violations of law in court, while permitting a public examination of the basis for administrative action.

S.Rep. No. 813, 89th Cong., 1st Sess. 2, 7 (1965) (emphasis added).

The House Committee Report reflects the same intent as the Senate Report, but the House version discusses the nature of the intent in greater detail. The House Report specifically states that the legislative intent was to require disclosure of "secret law," and not Agency "guidelines for auditing and inspection":

> In addition to the orders and opinions required to be made public by the present law, subsection (b) of S. 1160 would require agencies to make available statements of policy, interpretations, staff manuals, and instructions that affect any member of the public. This material is the end product of Federal administration. It has the force and effect of law in most cases, yet under the present statute these Federal agency decisions have been kept secret from the members of the public affected by the decisions.
>
> As the Federal Government has extended its activities to solve the Nation's expanding problems—and particularly in the 20 years since the Administrative Procedure Act was established—the bureaucracy has developed its own form of case law. This law is embodied in thousands of orders, opinions, statements, and instructions issued by hundreds of agencies. This is the material which would be made available under subsection (b) of S. 1160. However, under S. 1160 an agency may not be required to make available for public inspection and copying any advisory interpretation on a specific set of facts which is requested by and addressed to a particular person, provided that such interpretation is not cited or relied upon by any officer or employee of the agency as a precedent in the disposition of other cases. *Furthermore, an agency may not be required to make available those portions of its staff manuals and instructions which set forth criteria or guidelines for the staff in auditing or inspection procedures, or in the selection or handling of cases, such as operational tactics, allowable tolerances, or criteria for defense, prosecution, or settlement of cases.*

H.R.Rep. No. 1497, 89th Cong., 2d Sess. 7–8, U.S.Code Cong. & Admin.News 1966, pp. 2418, 2424 (1966) (emphasis added). It would be difficult to find a more precise basis for disposing of this case than the congressional intent expressed in the statement in the portion of the Report italicized above.

The specific agreement of the House and Senate Committee Reports, to exclude from disclosure "law enforcement matters" and "staff manuals and instructions which set forth criteria or guidelines for the staff in auditing and inspection procedures" forecloses appellants' claim for disclosure regardless of possible ambiguities raised by other more general portions of the statute

---

e. II–C–1, General Audit Step (12), including the immediately following Example, except that the first sentence of the audit step may be withheld;

2. Guidelines for Audit Modules, issued in February, 1975,

a. E–II–b.7,

b. E–II–b.8,

c. F–II–d,

d. F–II–f; and

3. Such headings and subheadings as are necessary for plaintiff to be able to ascertain which regulation or regulations each disclosed passage interprets.

J.A. 38–39.

and the Committee Reports,[4] as specific statements of legislative intent usually prevail over more general provisions.[5]

The information sought by appellants involves guidelines and instructions that unquestionably relate to law enforcement. The basic purpose of the Guidelines is to assure that the costs oil refiners use in computing their prices are correct and that the reports they make to the FEA are accurate. Where non-compliance is detected, corrective action is instituted *by Agency auditors* after concurrence with the National office. General Guidelines, p. 2. Thus, these individuals clearly serve as an arm of law enforcement, and their Guidelines are exempt.

Recent court decisions are in accord with an interpretation of the legislative history that would classify the documents requested by appellants as "law enforcement matters." In *City of Concord v. Ambrose*, 333 F.Supp. 958 (N.D.Cal.1971), where the plaintiffs sought access to the "texts used by the Bureau of Customs to train [its] law enforcement agents," Judge Wollenberg stated:

> The Senate Report reveals that the word "administrative" was inserted by way of committee amendment, and its purpose was to limit the provision to those materials "which pertain to administrative matters rather than to law enforcement matters" to protect "the traditional confidential nature of instructions to Government personnel prosecuting violations of law in court, while permitting a public examination of the basis for administrative action." The House Report states the concept similarly: "Furthermore, an agency may not be required to make available those portions of its staff manuals and instructions which set forth criteria or guidelines in auditing or inspection procedures, or * * * operational tactics * * *". Under either report, the documents sought here would clearly fall within the excluded class. *Id.* at 959–60 (footnotes omitted).

Our disposition of the request in *Cuneo v. Schlesinger*, 157 U.S.App.D.C. 368, 484 F.2d 1086 (1973), *cert. denied sub nom., Rosen v. Vaughn*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), is consistent with the above interpretation of section 552 (a)(2)(C). *Cuneo* involved the non-public portions of a Defense Contract Audit Manual which set forth the selective spot-check procedures to be followed by some 3,000 auditors in auditing approximately 43,000 Defense Department contracts involving upwards of $50 billion. The confidential portions of the manual prescribed what was to be audited, how audits should be conducted, the frequency of audits, and the reliance to be placed on the internal controls of contractors. Publication of such information would greatly assist those who desired to conceal overcharges to the Government, and the trial court held that the agency's audit-

---

4. The general rule of statutory construction is that a specific provision prevails over a more general one. *Fourco Glass Co. v. Transmirra Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957) stated the rule as follows: "However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling.' *Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 [52 S.Ct. 322, 323, 76 L.Ed. 704.]" *MacEvoy Co. v. United States*, 322 U.S. 102, 107 [64 S.Ct. 890, 894, 88 L.Ed. 1163].

5. This is the common intendment of people in writing and conversing, and is recognized in the application of provisos and special statutes over general statements and laws. Where statutes deal with a subject in both general and detailed terms, and there is conflict between the two, the detailed expression prevails. For example, *Preiser v. Rodriguez*, 411 U.S. 475, 489, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) held that the "specific habeas corpus statute" prevails over the "general" civil rights statute, 42 U.S.C. § 1983; *see, e. g., Bulova Watch Co. v. United States*, 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961); 4 Sutherland, Statutory Construction (Sands) § 51.05, 315 (1973); E. Crawford, Statutory Interpretation § 189 (1940). The same logic would recognize that when the two Houses were in agreement on the application of an act to a special situation, that they would not be deemed to intend to override that specific conclusion by general language.

ing procedures need not be disclosed.[6] The case was remanded so that the Government could attempt to "justify" that the manual was exempt from disclosure under Exemptions (2) or (5)[7] as against appellant's contention that the undisclosed material constituted "secret law" of the agency. The implicit holding in *Cuneo* is thus that the "game plan" for auditing Government contractors—to the extent that it does not involve secret law—may be withheld under Exemptions (2) or (5); otherwise, there would have been no necessity to remand the case. It is also significant, but not controlling on us, that appellant in *Cuneo* admitted that to the extent the Defense Contract Audit Manual set forth the "game plan" for the audit and investigation of contractors, "the public is [not entitled] to it." 157 U.S.App.D.C. at 371 n.8, 484 F.2d at 1089 n.8. This is sufficient to dispose of the case since, as stated above, what is specifically exempted by one portion of a statute is not to be reincluded by other general provisions. The foregoing interpretation gains added force from the failure of the dissent to contest it. *Supra* nn.4, 5; of 192 U.S.App.D.C., 721 of 591 F.2d, *infra.*

For the foregoing reasons, we find against appellants' principal contention.

## IV. THE THEORY BASED ON A GENERAL REQUIREMENT OF DISCLOSURE

Appellants' "alternative" theory (J.A. 6) relies not on characterizing the Guidelines as an "administrative staff manual," but on a *general* provision of the Freedom of Information Act which provides:

> Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is

made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

5 U.S.C. § 552(a)(3) (Supp. V 1975). By the same principle of statutory construction referred to above, since both Houses of Congress specifically indicated in their Committee Reports that law enforcement matter such as is involved in this case should be exempt from disclosure under 5 U.S.C. § 552(a)(2)(C), *it would be a mistake to interpret this latter general provision as requiring the disclosure of matter which the committee reports of both houses of Congress specifically indicated they intended to exempt from disclosure.*[8] In other words, once it is determined that the Guidelines meet the description of the exempt matter referred to in the Committee Reports with respect to subsection (a)(2), the nature of the *specific* Congressional intent indicated by both of those reports with respect to this matter should preclude appellants' claim on the theory that such matter must be disclosed under the *general* requirement of subsection (a)(3). Even though we need proceed no further in the consideration of appellants' alternative claim, we nevertheless choose to consider it more deeply so that the entire scheme of the Freedom of Information Act with respect to law enforcement matters may be properly understood.

### A. *Appellants' Basic Claim*

The foundation of appellants' claim under its "General Requirement of Disclosure" theory is the contention that the broad language of section (a)(3) requires disclosure of matter that the Committee Reports indicated was not required to be disclosed by section (a)(2).[9] It is beyond dispute that the Act is to be given a broad interpretation in

---

6. *Cuneo v. Laird*, 338 F.Supp. 504 (D.D.C. 1972).

7. Exemption 5 excludes from disclosure requirements "inter-agency or intra-agency memorandums [sic] or letters . . . ." 5 U.S.C. § 552(b)(5); see complete text at of 192 U.S.App.D.C., at 725 of 591 F.2d.

8. *See* notes 4 and 5, *supra.*

9. 5 U.S.C. § 552(a)(2) refers to "final opinions . . . statements of policy . . . instructions to staff . . . administrative staff manuals"; 5 U.S.C. § 552(a)(3) refers to "records" in general.

determining the documents that are subject to disclosure. *Department of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). In *Rose*, an opinion by Mr. Justice Brennan, the U. S. Air Force Academy was required to disclose the case records of cadets involved in a grade-cheating scandal. The decision denied the claim of the Academy that the requested material related solely to "internal personnel practices" protected from disclosure under Exemption 2 of the Act.

In denying any exemption from disclosure for the cadets' case records, Justice Brennan reiterated our statement in *Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 343, 484 F.2d 820, 823 (1973) (*Vaughn I*), that " '[t]he policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly.' " 425 U.S. at 366, 96 S.Ct. at 1601. This interpretation conforms to statements of Representative Moss, the principal House author of the Act, 112 Cong.Rec. 13654, and is certainly an important principle to be followed when construing the provisions of the Act. It should not, however, be so expansively applied as to render the specified exemptions practically meaningless. In *Vaughn v. Rosen*, 173 U.S.App.D.C. 187, 523 F.2d 1136 (1975) (*Vaughn II*), Judge Leventhal, concurring, found "more scope than the majority opinion contemplates for exemption 2." 173 U.S.App.D.C. at 198, 523 F.2d at 1147.

The exemptions are a vital part of the Act and should be given effect. The Supreme Court has invoked them on numerous occasions. *See Administrator, Federal Aviation Administration v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975); *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); *Environmental Protection Agency v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). *See also Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974). During the floor debate in the House of Representatives, the exemptions received considerable emphasis. Indeed, the exemptions were felt by the Act's sponsors to be so integral a part of the legislation that they were emphasized by outlining their complete scope and effect on two separate occasions (112 Cong.Rec. 13645, 13655). Representative John E. Moss of California, who was Chairman of the Governmental Affairs Subcommittee which handled the bill and who is generally recognized as one of the major forces that brought the Freedom of Information Act to fruition, and one of the leading authorities on the subject (112 Cong.Rec. 13643), also pointed to the "exempt . . . categories" as one of the "three major changes in the law." 112 Cong.Rec. 13642.[10]

---

**10.** Representative Moss was the Chairman of the Special Subcommittee on Government Information that over three and one-half years, from March 7, 1955 to November 12, 1958, held the lead hearings that produced the definitive research and supportive data which eventually led to the enactment of what is known today as the Freedom of Information Act. These hearings cover 3920 printed pages. *See* Hearings before a Subcommittee of the Committee on Government Operations, House of Representatives, 84th & 85th Congresses, November 7, 1955 to November 13, 1958. John E. Moss, California, Chairman; Dante E. Fascell, Florida; Clare E. Hoffman, Michigan; William L. Dawson, Illinois; ex officio. Representative Moss has been recognized nationally for his substantial contribution to a free press which resulted from his work on laws relating to the release of Government information. In 1958 he was awarded the John Peter Zenger Award (Los Angeles Times, December 21, 1958) and in 1963 the New York State Society of Newspaper Editors gave him its annual "Friends of the Free Press Award" (N.Y.Times, July 13, 1963, p. 18, col. 1).

An excerpt from the Congressional Record during the 1966 debates on the significant amendments to the Freedom of Information Act also calls attention to his contribution in this area:

The gentleman from California [Rep. John E. Moss] is recognized throughout the nation as one of the leading authorities on the subject of freedom of information. He has worked diligently for 12 years to bring this event to pass.

Remarks of Representative King of Utah on June 26, 1966 during consideration of S. 1160, 112 Cong.Rec. 13643. Senators Hennings and Long of Missouri, successively, assisted in the Senate. 112 Cong.Rec. 13642.

B. *The Nature of Exemption 2, 5 U.S.C. § 552(b)*

1. *Legislative History.*—Exemption 2 was added to the Freedom of Information Act in 1966. It provides:

(b) This section [11] does not apply to matters that are—

\*　\*　\*　\*　\*　\*

(2) related solely to the internal personnel rules and practices of an agency.

5 U.S.C. § 552(b)(2) (1970), 81 Stat. 55.

When the 1966 amendments to the Act were progressing through Congress, somewhat different explanations of Exemption 2 were set forth in the respective Senate and House Reports. The Senate Committee on the Judiciary—which reported out the Senate bill, S. 1160, that was eventually enacted—stated in its report:

Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.

S.Rep. No. 813, 89th Cong., 1st Sess. 8 (October 4, 1965). This was all the direct comment in the Senate Report on that exemption. The subsequent House Report on the Senate bill, filed during the next session of the 89th Congress, was more detailed as to the intent of Exemption 2:

2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all 'matters of internal management' such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.

H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (May 9, 1966), U.S.Code Cong. & Admin. News, p. 2427 (footnote omitted).

Examining the language of Exemption 2 and the Senate and House Committee Reports thereon, we conclude—as seems logical—that Congress did not intend to repeat itself in referring to "internal personnel rules and practices of an agency." [12] Ascribing this intent to Congress would result in the *practices* of an agency including its "internal . . . rules." Thus, if "internal" or "internal personnel" were construed to also modify "practices of an agency," the phrasing of Exemption 2 would be largely redundant. We believe that the two phrases should be read to refer separately to (1) internal personnel rules and (2) practices of an agency and to have the limited intent ascribed to them by both the House and Senate Reports.

The legislative history also clearly suggests that the Congress intended to ascribe an independent meaning to the phrase "practices of an agency." Seventeen House bills were introduced, ten of them on the same date as S. 1160, 111 Cong.Rec. 2780, 2946 (Feb. 17, 1965). Each contained an identical exemption for matters that are . . . (2) "related solely to the internal personnel rules and practices of any agency . . . .." [13]

The House hearings on the bills opened on March 30, 1965, six weeks before the Senate hearings began on May 14th, and some six months before the Senate Committee Report was filed on October 4, 1965. When a question was raised on the opening day of the House hearings as to the intent of the language that became Exemption 2,

11. The earlier portions of this section provides that agencies shall generally make their "records" available, *see* note 9, *supra*.

12. The dissent does not contradict this basic rule of statutory interpretation.

13. *Compare Federal Public Records Law, Part I: Hearings on H.R. 5012 et al. before the Foreign Operations and Government Information Subcomm. of the House Comm. on*

*Government Operations,* 89th Cong., 1st Sess. 3 (March 30–April 5, 1965) (statement of Rep. Moss) [hereinafter cited as *House Hearings* ], *with Administrative Procedure Act: Hearings on S. 1160 et al. before the Subcomm. on Administrative Practice and Procedure the Senate Comm. on the Judiciary,* 89th Cong., 1st Sess. 7 (May 12–14, 21, 1965) (statement of Sen. Ervin) [hereinafter cited as *Senate Hearings* ].

Representative John E. Moss, Chairman of the House Subcommittee, see 112 Cong.Rec. 13640–46 (1966), explained:

> What [Exemption 2] was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent.

*House Hearings, supra* at 29. Representative Moss's comments are supportive of a congressional intent to read the two phrases with a large degree of independence from each other. "[I]nternal *personnel* rules" refers more to employee relations between the agency and its employees, while "practices of an agency" refers more to the conduct of the employees in discharging the regulatory duties of the agency—in this case, enforcing the law.[14]

If the Senate Report stood alone, one might offhandedly conclude that no significant difference should be drawn between the references in Exemption 2 to "practices" as distinguished from "rules." Placing exclusive reliance on the Senate Report for the meaning of the entire exemption, however, would be misguided. The Senate Report does *not* attempt to cover the *entire* scope of Exemption 2. It makes no reference at all to "practices," but limits its comment to "rules"; it does not even purport to give a complete explanation of the "rules" exemption but only cites a *few* "examples," *i. e.,* "[e]xamples of these may be *rules* as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like."[15]

The House Committee, on the other hand, dealt further with the exemption and provided a more complete explanation, though limited, of the meaning of "practices of an agency." Its report does not deal solely with "*personnel* rules" but in obvious reference to the "practices of an agency" states that "[o]perating rules,[16] guidelines and manuals of procedure for government investigators or examiners would be exempt from this disclosure." House Report, *supra* at 15. Read closely, the House Report merely supplements the Senate Report by specifically limiting the exemptions Congress intended to make by the statute. The House Report does not *conflict* with the Senate Report (except in one minor aspect not relevant to this case). *See* note 16 *supra*. The Senate Report refers only to the "rules" portion of Exemption 2. The House Report, on the other hand, refers both to the "rules" and to the "practices" elements of the exemption. Since the Senate Report does not purport to deal with the "practices" portion of the subsection, the two reports are not contradictory on the only phase of the exemption that is applica-

---

14. At the House hearings, the Assistant Attorney General, Office of Legal Counsel, Department of Justice, who was testifying on the bill, and a counsel for the Subcommittee, in a colloquy off-handedly construed "personnel" as modifying "practices," etc., but admitted that they were "talking off the top of our heads," House Hearings, *supra* at 29–30. Such expressions do not even reach the standard of "curbstone opinions" and should not be recognized as an exposition of congressional intent. *Cf.* Dissent at - · of 192 U.S.App.D.C., at 742 of 591 F.2d. In contrast, the statement by Congressman Moss, was precise, declaratory and, as an author, it was authoritative. *E. g.,* Dissent at —— of 192 U.S.App.D C , at 742 of 591 F.2d. The dissent incorrectly interprets the colloquy insofar as Congressman Moss is concerned. Dissent at ——— of 192 U.S.App D.C., at 743–744 of 591 F.2d. It also overstates the breadth of the congressional intent when it quotes from the House Report at page 17, line 13, and fails to include the full language of the House Report that limits the phrase to "Government investigators or examiners." *Supra*, p. 45.

15. Senate Report, *supra*, at 8.

16. "Operating rules" are distinguishable from "*internal* personnel rules." Operating rules refer to the functioning of the agency in its public duties, i. e., vis-a-vis the public, and thus may be considered as "external" and "not internal." They are correctly characterized as "*operating* rules" and as such are covered by the more inclusive "practices of an agency" which both the statute and the House Report exempt from disclosure. Whether "operating rules, guidelines and manuals of procedure" are all restricted to "government investigators [and] examiners" need not be decided as we are only concerned here with "investigators and examiners" and it is clear that their manuals are covered.

ble here.[17] The intent expressed in the House Report is, therefore, controlling on the only application of the phase of the exemption with which we are here concerned. Excluding completely the House Report from any consideration and deeming the Senate Report controlling on the grounds that the House Report is contradicted by the Senate Report and that the latter was the only report before both Houses of Congress, would rest upon inaccurate perceptions of the legislative history of Exemption 2, which devolves from the explanations given by the respective Committee Reports, and from congressional practices in general.

The 1966 bills to amend the Freedom of Information Act were introduced in the House and the Senate on the *same day*, and the exemptions provided in these bills were practically identical. See text at —— of 192 U.S.App.D.C., at 721 of 591 F.2d, *supra*. This indicates that the principal sponsors in both houses were in agreement, prior to the introduction of the bills, upon the proposed rewriting of the "exemptions" as set forth in the respective bills—and as they were finally enacted. Even if the fact that the Senate Report was issued before that of the House entitles it to any superior influence, such precedence would be offset by the fact that the specific wording of the bill was generated by sources in both Houses prior to the introduction of the bills and thus prior to the drafting of either Committee Report. In view of such joint authorship, it would be hard to conclude that Representative Moss was not expressing the joint intent of the other principal sponsor (Senator Long of Missouri in the Senate, 112 Cong.Rec. 13642) when he stated at the *first* hearing on March 30, 1965 "[w]hat [Exemption 2] was intended to cover." House Hearings, *supra* at 29, quoted in text at —— of 192 U.S.App.D.C., at 724 of 591 F.2d, *supra*. The long-time participation of Representative Moss in this field of legislation also commands considerable if not controlling deference.

Reading the statute—as one must—in light of both the House and Senate Reports, we conclude that those who drafted the exemption intended the two phrases "internal personnel rules" and "practices of an agency" to have some disjunctive intendment, otherwise they would not have included both phrases. Although it is possible to read Exemption 2 as distinguishing "internal . . . practices of an agency" from "external" practices, and thus bringing only "internal" directions to the staff within the exemption, reading the phrases partially in the disjunctive gives the fullest effect possible to both Committee Reports and therefore should be preferred. Under this reading, even rules concededly having some "external" significance, and not related to "personnel", could still be included within the exemption to the extent that they could be classified as "practices of an agency" as referred to in the House Report. The dissent admits "it is conceivable that 'personnel' applies only to 'rules.' " Dissent at —— of 192 U.S.App.D.C., at 742 of 591 F.2d.

---

**17.** The only contradiction that might be said to exist between the two reports occurs in the House reference to *"working conditions,"* the disclosure of which is apparently required by the phrase: "Employee relations and *working conditions* and routine administrative procedures," (emphasis added) in the House Report. This could be said to be contradicted by the Senate provision with respect to rules on parking, lunch hours, sick leave and the like that the Senate Report stated were *exempt from disclosure.*

This is the extent of the difference. It is infinitesimal. Can one imagine that any agency would refuse to disclose what its "lunch hours" were for its employees, or where employees should park their cars? These can be determined easily by mere visual observation.

Likewise no agency would refuse to disclose the entitlement of employees to sick leave— and no person need request an agency to disclose such rules. Sick leave rules can be obtained for agencies throughout the Government. If there is any inconsistency between the House and the Senate Reports it is only to these inconsequential items that, in any event, are not involved in this case.

The contradiction in this minor respect does not make the non-contradictory parts of the two reports become contradictory as the dissent argues. Dissent at ——— of 192 U.S.App. D.C., at 745 of 591 F.2d.

*2. The Charge of Improper Congressional Conduct.*—The dissent charges the House Committee (which was spearheaded by Representative Moss) with "chicanery" in attempting to inject false legislative history into the Senate bill through the House Committee Report. Responses to that charge will not be made except as it relates to this bill. The record here shows that there was no "chicanery" in the House Report as to Exemption 2 and the dissent does not charge "chicanery" with respect to any other provision of the Act that is here relevant. When the bill reached the House from the Senate, the Senate Committee Report on Exemption 2 only gave a few "[e]xamples" of the types of *"rules"* it was *exempting from disclosure.* It never referred to the "practices of an agency." Thus, if no further explanation of Exemption 2 were given the "practices of an agency" would be wide open to be given their normal meaning and that would constitute a very *broad exemption.* It might even be deemed to cover "matters of internal management," but as the dissent states at —— of 192 U.S.App.D.C., at 742 of 591 F.2d, one of the principal purposes of the bill was to repeal the internal management exemption which was a feature of the then existing law. "Practices of an agency" would also cover *investigatory practices* and many other practices and *all practices* would be exempt from disclosure unless some limitation were placed on the statutory language.

Thus, because the Senate Committee Report left the "practices of an agency" part of the Exemption open to a very broad interpretation, which admittedly none of the authors ever intended, the House Committee Report severely and specifically limited the breadth of the Exemption to *investigatory manuals* and further *restricted* the Exemption by providing that specific "matters of internal management" such as "employee relations and working conditions and routine administrative procedures" *must be disclosed.* The dissent mistakenly views this House action as broadening the Exemption (Dissent at —— of 192 U.S.App.D.C., at 744 of 591 F.2d). In reality the House Report closed a big loophole. With respect

to investigatory manuals it did nothing more than state the precise intent elsewhere stated by the Committee Reports in both the Senate and House with respect to administrative staff manuals (*supra* at —— of 192 U.S.App.D.C., at 719 of 591 F.2d). And as to "matters of internal management" there is no disagreement that both Houses intended to repeal that existing statutory exemption. *See* Dissent at —— of 192 U.S.App.D.C., at 742 of 591 F.2d. Thus, the House Report did a more workmanlike job in setting forth the admitted intent of both Houses on this Exemption.

As to the charge of "chicanery" with respect to Exemption 2 the *record* completely belies the accusation and since the dissent did not extend the charge to any other feature relevant to this lawsuit, it is unnecessary to consider the charge in any other respect. We say the record here belies the charge for several reasons. First, Congressman Moss, the principal House author of the bill, stated *publicly* on the very first day of the House hearings, March 30, 1965, that the intent of Exemption 2 was to exempt "manuals of procedure [for] . . examiner[s]." *supra* ·at —— of 192 U.S. App.D.C., at 723 of 591 F.2d, dissent at —— of —— U.S.App.D.C., at 743 of 591 F.2d. Second, Congressman Moss publicly declared at the same time that he would "hope to see a way of doing the job [exempting examiners' manuals] without exempting internal rules and practices." In the same vein Congressman Moss added, "we are perfectly willing to work at it." House Hearings, *supra* at 29–30. Third, the Senate hearings did not begin until May 14th, some six weeks later, and the Senate Committee Report was not filed until October 4, 1965. Thus, no person can contend that something deceitful was being done with respect to Exemption 2 when the House did precisely what the principal author of the bill publicly stated they intended to "work at." Nor can it be contended that the Senate did not have ample opportunity to be informed of the House position. Fourth, the charge that there was some sinister *"last minute chicanery* by interest-

ed members of the House . . . just as the full committee in the House was about to report out the bill. . . ." (Dissent at —- of 192 U.S.App.D.C., at 746 of 591 F.2d, emphasis added), is flawed by the fact that committee reports are usually prepared at that stage in a bill's passage. In view of the public statement of Congressman Moss made on March 30, 1965, over 13 months before the House Committee Report was filed on May 9, 1966 (H.Rep. No. 1497, 89th Cong., 2d Sess.), it cannot be contended that that portion of the report dealing with Exemption 2 constituted "*last minute chicanery*"—and refuting that charge is all that concerns us here.

*3. Alternative Interpretive Approaches.*—Thus far, we have demonstrated that the House and Senate Reports do not conflict with each other, at least with respect to the portion of Exemption 2 with which we are concerned in this case. However, *even if* it were true that the Reports did conflict in their relevant parts, we would still be unable to accept appellants' argument that disclosure is required. One interpretive approach considers the timing of the publication of the relevant reports. Assuming *arguendo* that temporal priority in public declaration and publication is a factor to be considered in determining which sources of legislative history should be given precedence, Rep. Moss's interpretation of Exemption 2 would be controlling, as his public statement as to the scope of the exemption was made on March 30, 1965, while the Senate Report was not published until October 4, 1965, over six months later. It could just as easily be said that the statement of Representative Moss, reproduced in the House hearings, was before both Houses.

Even conceding that the statement in the Senate Report was the first committee expression of the meaning of Exemption 2 *and* that the Senate Report *conflicted* with the House Report, temporal priority in publication would not normally entitle the Senate Report to be considered as controlling *congressional* intent, short of some adoption

of the Senate Committee Report during consideration of the bill in the House. We have been unable to find any such adoption in the House proceedings. Contending that the Senate Reports should control on the facts of this case also misapprehends normal congressional procedure. Under settled congressional procedure, each House is a semi-autonomous body that legislates independently of the views of the other chamber. Reference may *not* be made to Senate debates in the House, and vice versa:

> It is a breach of order in debate to notice what has been said on the same subject in the other House, or the particular votes or majorities on it there; because the opinion of each House should be left to its own independency, not to be influenced by the proceedings of the other; and the quoting them might beget reflections leading to a misunderstanding between the two Houses. 8 Grey, 22.

Jefferson's Manual [§ 371] and the Rules of the House of Representatives, 95th Cong. 176 (1977).[18] The rule, which was the same in the 89th Congress, indicates the extent to which each House maintains its independence from the other. It is foreign to the normal practices and customs of either House to legislate on the basis of a printed report of the other House when it has a printed report of its own, and there is no indication in the legislative record of this bill that reference was made in the House proceedings to the Senate Report or that the latter was actually "before both houses . . . ."

The suggested alternative interpretive approaches do not help us here. When the House Report is not in conflict with the Senate Report, but rather covers a phase of the bill not mentioned by the Senate, the House Report should be relied upon to that extent. This renders inapplicable the dissent's references to the treatise of Professor Davis, dissent, —— of 192 U.S.App.D.C., 747 of 591 F.2d, because the two reports

---

**18.** *See also* 5 Hinds' Precedents of the House of Representatives § 6406, at 716 (1907) (reciting a ruling in the Senate where the rule referred to above was invoked to prohibit a Senator from

reading from the Congressional Record "the proceedings of the House, even as the basis of a question or order relating to the rights of the Senate.")

are *not* contradictory so far as their relevance to this case is concerned. *If the two reports were contradictory upon a certain point, and no other circumstance existed for relying on one over the other, neither could be relied upon as expressing the legislative intent of Congress as all legislation requires the joint concurrence of both Houses.* However, since the House Report was written later, it is actually a more complete expression of congressional intent than the Senate Report. The House Committee had an opportunity to review the inadequacies of the Senate Report and to remedy its omissions. In explaining the practices that were to be exempted, the House addressed in detail matters to which the Senate had given only limited attention.

4. *Case Law Guidance.*—Even if it were decided that the House and Senate Reports were in conflict, and if, given that ambiguity in the legislative intent, one should turn to judicial interpretations in attempting to discern the Congressional purpose, in no case would the purpose of the Act be seen to support appellants' demand for disclosure.[19] In *Rose, supra,* Justice Brennan left open the question whether Exemption 2 required agencies to disclose their auditing and inspection guidelines:[20]

> Those cases relying on the House, rather than the Senate, interpretation of Exemption 2, and permitting agency withholding of matters of some public interest, have done so only where necessary to prevent the circumvention of agency regulations that might result from disclosure

to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function. *See, e. g., Tietze v. Richardson,* 342 F.Supp. 610 (S.D.Tex.1972); *Cuneo v. Laird,* 338 F.Supp. 504 (D.C.1972), rev'd on other grounds, *sub nom. Cuneo v. Schlesinger,* 157 U.S.App.D.C. 368, 484 F.2d 1086 (1973); *City of Concord v. Ambrose,* 333 F.Supp. 958 (N.D.Cal.1971) (dictum). Moreover, the legislative history indicates that this was the primary concern of the committee drafting the House Report. See Hearings on H.R. 5012 before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 29–30 (1965), cited in H.R.Rep. No. 1497, p. 10 n.14. *We need not consider in this case the applicability of Exemption 2 in such circumstances, however, because, as the Court of Appeals recognized this is not a case "where knowledge of administrative procedures might help outsiders to circumvent regulations or standards. . . . "* 425 U.S. at 364, 96 S.Ct. at 1600 (emphasis added).

The manuals and guidelines requested by appellants consist of agency directions to the auditors of the FEA and thus contain "knowledge of administrative procedures [that] might help outsiders to circumvent regulations or standards"[21] of the Agency. In another remark in *Rose* Justice Brennan also indicated that Exemption 2 might apply where disclosure would risk circumvention of agency regulation:

**19.** *See* at —— of 192 U.S.App.D.C., at 731 734 of 591 F.2d, *infra*; *Hawkes v. Internal Revenue Service,* 467 F.2d 787 (6th Cir. 1972) which recognized an exemption of "law enforcement manuals . . . whose disclosure would significantly impede detection or prosecution of law violators" (J.A. 14).

**20.** The *dissent admits that the opinion of Justice Brennan left open this question but asserts that it is now closed by the dissent. See* dissent at —— of 192 U.S.App.D.C., at 749 of 591 F.2d. That still leaves it open in the Supreme Court, at least.

**21.** Department of *Air Force v. Rose,* 425 U.S. 352, 364, 96 S.Ct. 1592, 1600, 48 L.Ed.2d 11 (1976). Judge Flannery examined the Guide-

lines *in camera* and found that they laid out the "enforcement 'game plan' " which because "FEA auditors cannot possibly check each entry and computation necessary to determine whether refiners have complied with the regulations in full . . . must rely on spot checks, random sampling, and analysis of selected key figures . . .." (J.A. 41). To the extent that the requested Guidelines "outline the FEA's audit strategy," he found them to be exempt from disclosure under 5 U.S.C. § 552(b)(2), but required the disclosure of all "documents which contain *interpretation* of applicable statutes and regulations . . .." (J.A. 40) (emphasis added). We support such a construction of the FOIA.

In sum, we think that, *at least where the situation is not one where disclosure may risk circumvention of agency regulation,* Exemption 2 is not applicable to matters subject to such a genuine and significant public interest.

425 U.S. at 369, 96 S.Ct. at 1603 (emphasis added). It is therefore clear that *Rose* leaves unresolved the issue before this Court.

Indeed, more than merely leaving the issue in this case unresolved, *Rose,* if anything, lends support toward the holding we reach today. We conclude above that assuming the Senate Report conflicts with the House Report and assuming that the statement in the Senate Report was the first congressional expression of the meaning of Exemption 2, the fact that the Senate Report was published first would not normally entitle it to be considered as controlling congressional intent, absent some sort of adoption of it during consideration of the bill in the House. *Rose* is consistent with this conclusion: the Court, quoting with approval from *Vaughn v. Rosen, supra,* referred to the commentary of Professor Davis, stating that "[t]he content of the law must depend upon the intent of both Houses, not of just one." 425 U.S. at 366, 96 S.Ct. at 1601.

Recognizing the requirement for the concurrence of both Houses in discerning the law's content, Justice Brennan stated further:

> For the reasons stated by Judge Wilkey [in *Vaughn v. Rosen*], *and* because we think the *primary focus of the House Report* was on exemption of disclosures that might enable the regulated to circumvent agency regulations, we too "choose to rely upon the Senate Report" *in this regard.*[22]

425 U.S. at 366–67, 96 S.Ct. at 1601 (emphasis added). This statement, which is basic to the holding in the case, contains Justice Brennan's reasons for relying upon the Senate Report *in this regard,* meaning in regard to both the Evaluations by the Civil Service Commission at issue in *Vaughn* and the personnel case summaries in *Rose* : The Senate Report was available to both Houses, *and* the Senate Report was not in conflict with the "*primary focus* of the House Report." Of course, if the two Reports had been in conflict, the dual concurrence necessary for an ascertainable legislative intent would not have been present as Justice Brennan reasoned in *Rose.*[23] In other words, the Senate Report in *Rose* did not support an interpretation that the cadets' personal case summaries were within the "internal personnel rules" exemption, and this construction was *not* contradicted by the "primary focus of the House Report." Thus, far from ignoring the ·intent expressed by the House Report that "disclosures that might enable the regulated to circumvent agency regulation" were within Exemption 2, *Rose* lends weight toward the view that the House Report should be accorded some significance in this case.

In this connection, it should also be noted what *Rose* does *not* hold. It does not hold that a Congressional committee report, prepared by the House initiating a bill that eventually becomes law without being returned to the initiating body, is controlling as to legislative intent solely because it was available to both Houses. Nor does *Rose* hold that the first Committee Report is prima facie controlling in its entirety if the bill is not returned to the House where the bill was first passed. Nor does it hold that a Committee Report need be passed upon by the other House in order to be held as reflective of Congressional intent: if that were the rule, the Committee Report of the second House would *never* be reflective of Congressional intent where the bill was not

---

**22.** The dissent seems oblivious to the significance of the limitation "in this regard." It indicates reliance on the Senate Report in regard to the *Rose* case because that case was *not* one where the disclosures "might enable the regulated to circumvent agency regulation . . . .."

**23.** The dissent ignores this defect in its argument when it contends that the two committee reports are contradictory.

returned to the House where it was introduced. *Rose* does not restrict our ability to analyze legislative history in any of these respects. Thus, in circumstances like those presented in this case, the second report may be relied upon to reflect legislative intent because each House acts *independently*, and, if any Committee Report is not helpful, the dual intent of both Houses can be garnered from the action of the other House from the language of the bill itself, from floor debates, from the hearings, from prior legislation, from an analysis of the mischief sought to be recorded, from other provisions of the bill, and from other manifestations of intent.

Yet the primary importance of *Rose* for this case is its holding that the Court is free to rely upon the intent expressed by the Committee that first processed the bill through a House, because the intent expressed in the *first report* was *not contradicted* by the "primary focus" of the report of the second Committee on the *particular* issue before the Court. Thus, *Rose* allows us to rely upon the 1966 House Report for matters of legislative intent with respect both to Exemption 2 and to other parts of the bill to the extent that the intent therein expressed is not contradicted by the Senate Report or is not unreliable for other reasons. The earlier quoted statement of Justice Brennan has special significance concerning the commentary of the House Report on the law enforcement guidelines: it is a particularly clear expression that *Rose* left open the issue as to the effect of Exemption 2 on law enforcement guidelines, where (as is the situation in this case) "disclosure may risk circumvention of agency regulation" (*id.*).

Thus, it can be concluded that Justice Brennan in *Rose* would hold that the two reports here in question were *focusing* on two statements of Congressional intent that were not in conflict. Justice Brennan did not hold that the *contradicted* intent of only one House controlled solely because it was available to both Houses. This conclusion is relevant here. The intent expressed in each Report, with a minor exception, can be given its full effect without infringing on the other. Most importantly, there is nothing in the language of the 1965 Senate Report that would exclude law enforcement guidelines from the exemption; hence, neither is our decision in conflict with *Vaughn v. Rosen* or *Rose* nor does it seek to reverse those decisions. This case simply involves a different phase of the statute and of Exemption 2 than that which was ruled upon in *Vaughn* or *Rose*, as Justice Brennan pointed out.

5. *Policy Considerations.*—Not only does the language of Exemption 2, which protects the "practices of an agency" to the extent expressed in the House Report and to the extent that secret law is not involved, indicate that agency manuals covering the *operational* practices of its auditors and investigators are meant to be exempt from disclosure, as the House Committee Report states, but normal policy considerations also require that such documents remain confidential. Why should an employee who seeks to embezzle money from a bank be given access to the examiner's special instructions for auditing his type of bank so that he can discover how to disguise his defalcations? The same situation can be posited with all auditing and investigation manuals utilized in investigating compliance with federal law. To turn such manuals over to those who are the subject of regulatory supervision is to dig a den for the fox inside the chicken coop. These manuals clearly set forth agency *practice* and procedures in law enforcement and it would be absurd to attribute to Congress an intent to require such documents to be disclosed to those whose compliance with the law is being investigated.

6. *Summary.*—Judicial precedent and legislative history both support the view that the documents requested by appellants need not be disclosed under the provisions of the Freedom of Information Act. The guidelines that are requested plainly fall within the language of Exemption 2 to that Act. They set forth special "*practices of an agency*" (emphasis added) that direct auditors of the Energy Administration in the manner of executing audits of publicly reg-

ulated refinery companies. Given that the purpose of these audits is to aid in investigations designed to enforce the law, the documents requested are in fact "*law enforcement guidelines*" for Government investigators and examiners which are specifically protected from disclosure, rather than "*administrative* staff manuals" (emphasis added) which must be revealed under section 552(a)(2)(C) or under the general requirement for disclosure.[24]

## V. THE SCHEME OF THE OTHER EXEMPTIONS

We have thus far concluded that the Freedom of Information Act must be interpreted as exempting from disclosure staff manuals and instructions insofar as they constitute law enforcement matters which set forth criteria or guidelines for the performance of audits or investigations in connection with matters involving compliance with the laws and rules administered by the Federal Energy Administration. We have

based this conclusion primarily on a careful analysis of the language of the statute and the corresponding Congressional intent. Our conclusion is buttressed by that fact that it is consistent with the general scheme of other exemptions.[25]

### A. The Effect of Exemption 7 on the Interpretation of Exemption 2

Strong support for interpreting Exemption 2 as excluding "law enforcement matters" is also found in the provisions of Exemption 7. The relevant subsection provides:

(b) This section does not apply to matters that are—

\*　　\*　　\*　　\*　　\*　　\*

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would [inter alia] (A) interfere with enforcement proceedings, . . . (E) *disclose investigative techniques and procedures* . . . .[26]

---

**24.** In reaching this conclusion, we do not trench in any way on our holding in *Vaughn v. Rosen*, 173 U.S.App.D.C. 187, 194, 523 F.2d 1136, 1143 (1975) ( *Vaughn II* ), with respect to the application of the Senate Committee Report for determining the intent of Exemption 2 with respect to the documentary matter there in question. *Vaughn II* never involved the application of the exemptions to *law enforcement matters* or the effect thereon of the House Committee Report.

*Vaughn II* cites several cases which, like *Vaughn II*, are not controlling here. 173 U.S. App.D.C. 192 n.13, 523 F.2d at 1141 n.13. *See Stokes v. Brennan*, 476 F.2d 699 (5th Cir. 1973) (OSHA training manuals deemed to be administrative manuals); *Consumers Union of United States, Inc. v. Veterans Administration*, 301 F.Supp. 796, 801 (S.D.N.Y.1969), *appeal dismissed as moot*, 436 F.2d 1363 (2d Cir. 1971) (data on hearing aid tests); *Benson v. General Services Administration,* 289 F.Supp. 590, 595 (W.D.Wash.1968), *aff'd on other grounds*, 415 F.2d 878 (9th Cir. 1969) (contract-related documents); *Getman v. NLRB*, 146 U.S.App.D.C. 209, 450 F.2d 670 (1971) (*Excelsior* lists maintained by NLRB). In *Stern v. Richardson*, 367 F.Supp. 1316 (D.D.C.1973), documents related to a counter-intelligence program of the FBI were requested, but the court did not discuss whether the documents were administrative or law enforcement related. *Hawkes v. Internal Revenue Service*, 467 F.2d 787 (6th Cir. 1972), indicates that the intent of 5 U.S.C.

§ 552(a)(2)(C) "was to bar disclosure of information which, if known to the public, would *significantly impede* the enforcement process." 467 F.2d at 795 (emphasis original). We, of course, are not bound by the holding in *Hawkes* concerning the IRS manuals there in question, and we find in this case that disclosure of the requested materials *would* significantly impede the enforcement process.

**25.** That appellant only contended that Exemption 2 does not exempt the requested documents from disclosure (R. 18) does not prohibit this court from relying on other provisions of the Act to prove that appellant's statutory construction is incorrect. *Cf.* dissent, ——— —— of 192 U.S.App.D.C., 751 of 591 F.2d.

**26.** The original statutory provision providing the public with some access to Government information was contained in § 3 of the Administrative Procedure Act (Public Law 404, June 11, 1946, 60 Stat. 238). However, there were several conditions that greatly inhibited disclosure and these were fully disclosed in the Moss hearings (1955–58). Congress finally, by Public Law 89–487, July 4, 1966, 80 Stat. 250, broadened the disclosure provisions and included an exemption section which closely paralleled the present law. Further amendments were made the next year by Public Law 90–253, June 5, 1967, 81 Stat. 54–55. Title 5, U.S.C. § 552 was subsequently amended by Public Law 93–502, Nov. 21, 1974, 88 Stat.

5 U.S.C. § 552(b)(7) (Supp. V, 1975) (emphasis added). Since this portion of the statute *exempts* investigatory records from disclosure where their disclosure would help those who are subject to agency regulation to discover *investigative techniques and procedures*, it would be unreasonable to hold that Congress did not also intend by Exemption 2 to exempt the investigatory staff manuals insofar as they explicitly set out these *same* investigative techniques and procedures.

Exemption 2 would be inconsistent with the adoption of Exemption 7 if the former exemption is construed to require the disclosure of matter related to "law enforcement purposes [that would lead to the disclosure of] investigative techniques and procedures." It would be absurd to find that Congress intended to exempt such matter from disclosure by one provision of the statute and require its disclosure by another. Indeed, from the very beginning, Congress indicated its concern that the Freedom of Information Act not impede enforcement of the criminal laws. This is particularly evident in Exemption 7. Yet since the Act constitutes an entire *scheme*, it would be improvident to interpret one exemption, such as Exemption 2, in a manner that authorizes disclosure not contemplated by the *scheme* of the Act. The various parts

of a statute should, if possible, be harmonized so as to provide throughout for a consistent interpretation. *United States v. Raynor*, 302 U.S. 540, 547, 58 S.Ct. 353, 82 L.Ed. 413 (1938); *New Lamp Chimney Co. v. Ansonia Brass & Copper Co.*, 91 U.S. 656, 663, 23 L.Ed. 336 (1876); *Perrine v. Chesapeake & D. Canal Co.*, 50 U.S. 172, 187, 13 L.Ed. 92 (1850). We thus refuse to interpret Exemption 2 as requiring the disclosure of matter that it is the objective of Exemption 7 to protect.[27]

B.  *Intra-Agency "Memoranda" and Exemption 5*

An additional basis for not requiring disclosure is set forth in Exemption 5 which provides:

(b) This section does not apply to matters that are—

\*      \*      \*      \*      \*      \*

(5) inter-agency or *intra-agency memorandums* or letters which would not be available by law to a party other than an agency in litigation with the agency.

5 U.S.C. § 552(b)(5) (emphasis added).

The basic purpose of this provision is to exempt from disclosure the internal communications of an agency in order to protect its deliberative processes.[28] In effect,

---

1563–64. It was this 1974 enactment that amended Exemption 7 to exempt:

(7) Investigatory records complied for law enforcement purposes, but only to the extent that the production of such records would . . . (E) disclose investigative techniques and procedures . . . .

The report of the Conference Committee, where this provision originated, indicated that it did not intend to alter the requirements of § 552(a)(2) with respect to "*administrative* staff manuals," etc. (emphasis added).

The conferees wish to make clear that the scope of this exception against disclosure of "investigative techniques and procedures" should not be interpreted to include routine techniques and procedures already well known to the public, such as ballistics tests, fingerprinting, and other scientific tests or commonly known techniques. *Nor is this exemption intended to include records falling within the scope of subsection 552(a)(2) of the Freedom of Information law, such as administrative staff manuals and instructions to staff that affect a member of the public.*

H.R.Rep. No. 93–1380, 93d Cong., 2d Sess. 229–30 (emphasis added) (Joint Committee Print, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (P.L. 93–502) (1975). Thus, the requirement to disclose *administrative* staff manuals and not to require the disclosure of law enforcement matters continues unchanged. *See* III, *supra.*

27. This is not to say, as the dissent suggests, that we would hold the requested matter here to be exempt from disclosure by Exemption 7. The two exemptions operate on different matter, but they have identical objectives, *i. e.*, to not disclose investigative techniques and procedures. Section 552(a)(2)(C) operates in this case before the investigation while Exemption 7 operates *after* the record is compiled.

28. *Polymers, Inc. v. NLRB*, 414 F.2d 999 (2d Cir. 1969), *cert. denied*, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970), upheld the refusal of the NLRB to disclose "a guide to the conduct of elections" on the ground that it was "an internal advisory document for the use of Board personnel and plays no significant role in

the exemption protects from disclosure those documents which would not be routinely available to a party in litigation with an agency through civil discovery procedures. *Environmental Protection Agency v. Mink*, 410 U.S. 73, 85–86, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Documents normally privileged in the civil discovery context need not be disclosed. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). As discussed in *Sears, Roebuck & Co.*, one purpose of the exemption is to prevent injury to the quality of agency decisions and another is to protect the "work-product privileges" generally available in the attorney-client context to all litigants, 421 U.S. at 149, 95 S.Ct. 1504. The Court has stated that the quality of a decision is not impaired by disclosures made after the decision which are designed to explain it; however, the Court has indicated that the disclosure of predecisional communications can impair the deliberative process by inhibiting discussion by policymakers and their advisors. *Sears, Roebuck & Co., supra*, at 151–2, 95 S.Ct. 1504; *Mink, supra*, 410 U.S. at 87–89, 93 S.Ct. 827. The same can be said with respect to the instructions given to auditors for predecisional audits and investigations where the audits are conducted preliminarily to the making of law enforcement decisions. As Judge McGowan stated in *Merrill v. Federal Open Market Committee*, 184 U.S.App.D.C. 203, 211, 565 F.2d 778, 786 (1977), "[e]fficient fact-gathering is an essential first step in the decisionmaking process." To disclose the agency's auditing and investigatory guidelines to those regulated companies that are to be audited and investigated would interfere with the ability to gather correct factual information and, by forcing those engaged in the deliberative process to base their decisions on investigatory records in which vital incriminating facts may be concealed because of prior warning, would undercut efficient law enforcement.

Applying these principles, the Supreme Court held in *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975), that certain documents gathered by a Regional Board and its "divisions," which had the duty under the Renegotiation Act of 1951 of determining whether certain government contractors have earned and must refund excessive profits on their government contracts, constitute pre-decisional consultative memoranda exempt from disclosure by Exemption 5. These documents contained data germane to the question of whether statutory requirements for recoupment of excess profits should be imposed against government contractors in particular instances. Since such pre-decisional consultative memoranda are exempt from disclosure under Exemption 5 as "intra-agency memoranda," the instructions to auditors and investigators for their preparation of similar factual data to be used in determining law enforcement in all cases should likewise be exempt on the same theory, *i. e.*, that the data is collected prior to the agency reaching a decision as to the compliance of the investigated party with the law.

Of course, as we noted earlier, to the extent that any of these instructions contain "secret law," they must be disclosed (Op. at —— of 192 U.S.App.D.C., at 718 of 591 F.2d). But these Guidelines concern the methodology for predecisional fact-gathering, which is one of the "ingredients of the decision-making process" and which should similarly be exempt from disclosure. *See United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 999, 82 L.Ed. 1129 (1938). Thus, while the language of Exemption 5 should not be applied to all memoranda, it definitely does include executive memoranda which constitute instructions to investigators for discovering facts as to whether regulated par-

the Board's adjudication of election disputes." As such it was exempt under § 552(b)(2) and under (b)(5) as an "intra-agency memorandum." The NLRB earlier complied with a request to produce the "NLRB case Handling Manual."

ties are complying with the law that the agency is charged to enforce.[29]

Whether the agency materials take the form of a memorandum, letter, bulletin, or some other kind of internal communication which may embody a compilation of intra-agency memoranda in a manual, would seem to be immaterial. Certainly any form of intra-agency communication—excluding, of course, directions as to agency law—that discloses investigatory strategy or operational tactics related to law enforcement should be exempt from disclosure if the agency is to function efficiently.[30] While smaller agencies may be able to instruct their auditors by memoranda and letters, larger agencies find it more convenient to set forth their instructive guidelines in manuals. We are unable to perceive any significant difference between "manuals" and "memoranda" that contain guidelines and instructions for law enforcement.

Moreover, we have, as did the trial judge, closely examined *in camera* the matters requested by appellants. We note that the matter comprises a loose-leaf compilation, the periodic supplementation of which is clearly contemplated, and that over one-third of the documents requested were originally released to the staff as "memoranda" and still bear such title. We therefore find that the Guidelines here in question meet the basic requirement of being internal staff communications and are exempt from disclosure not only under Exemption 2, but also under the limited congressional intent expressed by Exemption 5 as "intra-agency

memoranda," *City of Concord v. Ambrose, supra,* 333 F.Supp. at 960–61, prepared as the initial step in the deliberative process of the agency.

## VI. THE GOVERNMENT IN THE SUNSHINE ACT

It is contended by the dissent [31] that the recent enactment of the Government in the Sunshine Act (hereafter, Sunshine Act), P.L. 94–409, Act of September 13, 1976, 90 Stat. 1241 *et seq.,* supports the construction by the dissent of Exemption 2 in the Freedom of Information Act. The claim is that the language of Exemption 2 in the Freedom of Information Act and the Committee Report on that subsection of the Sunshine Act is allegedly supportive of the construction that the dissent argues for here.

The Committee's report states *generally* that "manuals or directives setting forth job *functions* or *procedures*"[32] (emphasis added) are not exempt from disclosure. Even if this provision were to be held to be controlling it must be noted that the special investigatory guidelines and memoranda instructions for auditing refineries are not to be considered as "*job* functions or procedures." They are *special* investigatory instructions dealing with a special audit. For example, the job function is to audit refineries to determine whether they are complying with the law and the regulations in computing their prices. The special investigation instructions required by a shortage of personnel may be to conduct only certain spot checks and certain random sampling

**29.** We note that nothing in this opinion is inconsistent with our recent decision in *Merrill v. Federal Open Market Committee, supra.* In that case, we specifically found that the facts did not implicate a law enforcement matter: "Disclosure here would not affect government law enforcement activities or prejudice a judicial proceeding." 565 F.2d at 787.

**30.** Our function as a reviewing court is to consider whether the "plaintiffs' need for access to the documents . . . must be overridden by some higher requirement of confidentiality." *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 385, 391, 463 F.2d 788, 794 (1971). Here, the higher requirement of confidentiality rests upon the need to preserve the effectiveness of the law enforcement process. Subordinating this interest in confi-

dentiality by releasing information on law enforcement techniques and procedures would significantly impede the law enforcement process. *See* note 21 *supra; City of Concord v. Ambrose,* 333 F.Supp. 958, 959 (N.D.Cal.1971).

**31.** Contrary to what it argues elsewhere is impermissible conduct (dissent, ——–—— of 192 U.S.App.D.C., 750–752 of 591 F.2d), the dissent in its opinion at pages ——, ——–—— of 192 U.S.App.D.C., at pages 737, 748–749 of 591 F.2d, injects the Sunshine Act into this case for the first time.

**32.** H. Rep. 94–880, Part I, on H.R. 11656, 94th Cong., 2d Sess., 9, March 8, 1976, U.S.Code Cong. of Admin.News 1976, pp. 2183, 2191.

and possibly ignore travel expense statements except for principal executives. The former functions are disclosable, the latter instructions are not.

But a more important reason exists for Congress not giving Exemption 2 in the Sunshine Act a more expansive intendment as it did in the FOIA. This is because Exemption 7 of the Sunshine Act, 5 U.S.C. § 552b(c)(7), specifically provides that the requirement that "every portion of every meeting of an agency shall be open to public observation," 5 U.S.C. § 552b, does not require any agency to—

> (7) disclose investigatory records compiled for law enforcement purposes, *or information which if written would be contained in such records,* but only to the extent that the production of such records or information would (A) interfere with enforcement proceedings, . . .[33]

5 U.S.C. § 552b(c)(7). Thus, Congress in the Sunshine Act writes in practically the same exemption that it did in the Freedom of Information Act but it does it in a different manner.

In addition the Sunshine Act carrying out the same intent for other agencies has a specific exemption for information related to examination of financial institutions (Exemption 8) and "information [related to the markets or financial institutions] the premature disclosure of which would—. . . be likely to significantly frustrate implementation of a proposed agency action." (Exemption 9).

The foregoing should be sufficient to disprove the suggested relevancy of the Sunshine Act to this case. One involves "meetings" and the other primarily documents. Where they have some overlapping objectives we see that neither was unmindful of the special status that should be afforded to matter relating to "investigatory" instructions. Thus, the Sunshine Act does not cloud up the Freedom of Information Act.[34]

---

**33.** For Committee Report *see* H. Rep. 94-880, *supra,* p. 11.

**34.** Certain disjointed points in the dissent are commented upon as follows:

1. Much of the dissent is based upon the constant reiteration that disclosure is the general rule and that exemptions are to be narrowly construed. Dissent at ——, ——, ——, ——, ——, ——, ——, —— of 192 U.S.App.D.C., at 738, 739, 740, 742, 744, 746, 749, of 591 F.2d. This is correct but it does not justify ignoring the expressed intent of Congress.

2. Specific disagreement is noted as to the statement in the dissent that it "is immaterial under the FOIA . . . that the documents would be 'useful only for the purpose of evading regulation . . .'" Dissent, —— of 192 U.S.App.D.C., 738 of 591 F.2d. Also, in stating that matter can *only* be exempted from disclosure by one of the nine exemptions, the dissent overlooks the fact that Congress otherwise specifically indicated an intent to *not cover* law enforcement matters including auditing instructions. *Supra,* at ——, —— of 192 U.S. App.D.C., p. 719 of 591 F.2d.

3. It is correct, as the dissent states at —— of 192 U.S.App.D.C., at p. 738 of 591 F.2d that applicants need not state their purpose, but when this is known it may constitute positive proof, as here, that the intent of the act would be violated by compelling disclosure. In other words, that exemption from disclosure would be consistent with the intent of Congress.

4. When the District Court stated that the public does not have a "legitimate interest" in the requested disclosure it was merely saying that the disclosure sought by appellant would accomplish a result that the law intended to prohibit. *Cf.* dissent at ——, —— of 192 U.S. App.D.C., at pp. 738, 739 of 591 F.2d.

5. The attack the dissent makes on the trial court applying a "balancing" test, *id.,* —— of —— U.S.App.D.C., 739 of 591 F.2d, has no relevance to the majority opinion which bases its exclusion from disclosure on the expressed intent of Congress. The "best interests of this country" (*Id.,* —— of 192 U.S.App.D.C., 739 of 591 F.2d) need not be ignored if that is consistent with congressional intent.

6. In text at —— of 192 U.S.App.D.C., at 723 of 591 F.2d and in footnotes 23, 24 and 25 the dissent contends that three witnesses before the Senate Sub-Committee expressed the opinion that the bill did not protect investigative manuals and that some change would be required in the bill if that result was intended. However, these opinions were expressed at the sub-committee hearings on May 12, 14 and 21, 1965 long *before* the Senate Committee Report of October 4, 1965 stated the congressional intent to be that "law enforcement matters" were to be protected from disclosure. Appellants also admit that "law enforcement material whose disclosure would significantly impede detection or prosecution of law violators" is not required to be disclosed (J.A. 14, and n.3, *supra* ).

## VII. MODIFICATION OF THE DISTRICT COURT ORDER

It was heretofore noted that the trial court (Flannery, J.) ordered the disclosure of certain designated parts of the requested matter. We have checked the court's order against all the requested matter and we affirm the disclosure it directs. However, there are two additional items that, while their required disclosure might be more doubtful, because we perceive they *partially* include instructions as to agency law, we conclude should be disclosed. These two items are:

Guidelines for Audit Modules:

(a) G–II–h. Revised February 1975

(b) C–II–c, (4) March 21, 1975

7. In its point II the dissent (*Id.* of 192 U.S.App.D.C., 740 of 591 F.2d) incorrectly characterizes the arguments of the Agency on this appeal. These are more accurately stated in the Government brief as follows:

. . . we demonstrate that the prior decisions involving law enforcement manuals and the legislative history of Exemption 2 support withholding of information which would permit individuals to foil effective agency regulation. By the same token, the cases upon which plaintiff places primary reliance have not involved questions of possible evasion of agency regulation and therefore provide no support for plaintiff's case.

Govt. Br., at 6. Principally the Government does not argue for a "balancing" test.

8. The dissent asserts that every other court and commentator that has dealt with Exemption 2 has treated the Senate and House Reports as being contradictory. Even if that were correct it would not change their true character. Some of the prior opinions have not read the two reports closely as applied to investigatory instructions that could frustrate enforcement, have not adequately reflected upon the earlier statement of Congressman Moss on the opening day of all congressional hearings, and where they have reflected upon law enforcement manuals that do not set forth secret law they have held for non-disclosure. Justice Brennan recognizes this in his comment and the cases he cited in *Rose, see* text *supra,* 23. Judge Leventhal's concurring opinion in *Vaughn v. Rosen,* 173 U.S.App.D.C. 187, 203, 523 F.2d 1136, 1152 (1975) correctly describes the situation:

. . . Cases that have previously analyzed the applicability of exemption 2 have done so largely in the discrete context of deciding disclosability of government manu-

Our judgment will accordingly direct the court to add these two items to the matter to be disclosed.

## CONCLUSION

The Freedom of Information Act requires the disclosure of all agency matter necessary for any person to deal with the agency (such as secret law), but must be interpreted as exempting from disclosure those staff manuals and instructions insofar as they are law enforcement matters which set forth criteria or guidelines for the performance of audits or investigations in connection with matters involving compliance with the laws and rules administered by the Federal Energy Administration. The Agency, however, may release any of such material if it considers it to be in the public interest to do so.[35]

als. These manuals set guidelines for employees carrying out agency policies applicable to the public. The courts have ordered disclosure of "secret law" as within the disclosure mandate of 5 U.S.C. § 552(a)(2)(C) ('administrative staff manual . . . that affect[s] a member of the public'), *while protecting agency techniques that if disclosed would materially lessen the agency's effectiveness vis-a-vis the public it regulates. . .* (emphasis supplied; footnote omitted).

9. Our decision in *Doe v. McMillan,* 148 U.S.App.D.C. 280, 287, 459 F.2d 1304, 1311 n.10 (1972) is distinguishable from the instant case in that the complaint in *Doe* never asserted any cause of action based on the House Rules which they attempted to raise for the first time in the Court of Appeals. *See* 459 F.2d at 1308. We stated that this was impermissible but also pointed out the deficiencies in that claim. *See* note 10. In this case, however, the Government in its pleadings alleged that the entire complaint failed to state a claim, that plaintiff lacked jurisdiction because the records sought were exempt under all of § 552(b) (R.3) and denied completely that appellants had any rights under § 552(a)(2)(C) or § 552(a)(3) (R.3) Thus, the pleadings in *Doe* and this case are completely different and the latter permit the opinion to rely upon statutory defenses raised by the pleadings.

35. The Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act, as revised effective July 4, 1967, made the following comments with respect to Exemption 2:

(2) INTERNAL PROCEDURES

"[The provisions of] this section [shall not be applicable] to matters that are * * * (2) related solely to the internal personnel rules and practices of any agency;"

For the foregoing reasons we affirm the judgment of the District Court with the single modification indicated in Part VII, *supra*.[36]

*Judgment accordingly.*

WILKEY, Circuit Judge, dissenting:

This is quite plainly a case in which my Brothers have voted their "druthers", rather than construed a statute. I can sympathize with their "druthers",[1] but we are sitting in a court and not in a legislature. Whatever the wiser policy may be in regard to exempting from disclosure the Guidelines at issue here, the law Congress passed in 1966 did *not*, as Congress itself has most recently reaffirmed,[2] and I must respectfully dissent from my colleagues' well-intentioned effort to repair Congress' faulty handiwork.

## I. ORIGIN OF CONTROVERSY

In discharging its duty of enforcing federal pricing regulations implementing the Emergency Petroleum Allocation Act of 1973[3] the FEA periodically reviews the records of oil refiners and others for indications of possible violations. Of necessity the FEA is not a complete audit, but a system of spot checks, random samplings, and analysis of significant indicators. The "Guidelines" for FEA audit personnel deal

---

The House report explains that the words "personnel rules and practices" in subsection (e) are meant to relate to those matters which are for the guidance of agency personnel only, including internal rules and practices which cannot be disclosed to the public without substantial prejudice to the effective performance of a significant agency function. The examples cited in the House report (H.Rept., 10) are "operating rules, guidelines, and manuals of procedure for Government investigators or examiners." An agency cannot bargain effectively for the acquisition of lands or services or the disposition of surplus facilities if its instructions to its negotiators and its offers to prospective sellers or buyers are not kept confidential. Similarly, an agency must keep secret the circumstances under which it will conduct unannounced inspections or spot audits of supervised transactions to determine compliance with regulatory requirements. The moment such operations become predictable, their usefulness is destroyed.

As the examples cited in the House report indicate, the exemption in subsection (e)(2) is designed to permit the withholding of agency records relating to management operations to the extent that the proper performance of necessary agency functions requires such withholding. However, as the House report states, at page 10, "this exemption would not cover all 'matters of internal management' such as employee relations and working conditions and routine administrative procedures which are withheld under the present law." It follows that the exemption should not be invoked to authorize any denial of information relating to management operations when there is no strong reason for withholding. For example, the examining, investigative, personnel management, and appellate functions of the Civil Service Commission relate solely to internal personnel rules and prac-

tices of the Government and, as such, are covered by the exclusion in subsection (e)(2). However, the Commission now publishes all its regulations in the Federal Register, and its instructions are available to the public through the Federal Personnel Manual, which may be purchased at the U. S. Government Printing Office. This is an example of the exercise of the principle that the exemption, even though it may be literally applicable, should be invoked only when actually necessary.

*Id.* 30–31.

**36.** The charge that the intent of the Senate Report with respect to Exemption 2 is contradicted by the House Report on that exemption (H.R.Rep. No. 1497, 89th Cong. 2d Sess. 10 (May 9, 1966)), p. 15, U.S.Code Cong. & Admin. News, 1966 p. 2418, *supra*, is answered by the fact that the forepart of the House Report, which is attacked because it would exempt investigators' manuals, is completely in accord with the intent expressed by *both* the Senate and the House Committee Reports as to § (a)(2)(C), which directly state that "staff manuals [on] . . . law enforcement matters" (p. —— of 192 U.S.App.D.C., p. 719 of 591 F.2d, *supra*), and on "auditing and inspection procedures" (p. —— of 192 U.S.App.D.C., p. 719 of 591 F.2d, *supra*), are to be exempted from disclosure. It is also self-evident that unless the congressional intent of *both* Houses to exempt law enforcement matters from disclosure by virtue of § (a)(2)(C) is recognized there, or elsewhere, that the clearly admitted congressional purpose in this respect will be thwarted.

**1.** See note 58, *infra*.

**2.** See pp. —— ——— of 192 U.S.App.D.C., pp. 747–748 of 591 F.2d, *infra*.

**3.** 15 U.S.C. § 751 *et seq.*, as amended.

738

with the methods to be used, the areas in which inquiries are to be made, and the degree of intensity to which each area is to be subject to review.[4] The FEA contended that disclosure of the Guidelines "would allow refiners with access to the Guidelines to impede FEA's law enforcement activities by developing strategies to avoid detection of violations."[5] Plaintiff asserted that the information sought was necessary to curb allegedly improper actions by FEA auditors, making improper demands on the refiners, i. e., to make sure that the auditors kept within their own guidelines.[6]

The District Court agreed with the defendant FEA, finding that "the public may have an interest in the Guidelines, but it is not a legitimate interest, since the document is useful only for the purpose of evading regulation."[7]

## II. PURPOSE AND STRUCTURE OF THE FREEDOM OF INFORMATION ACT

### A. Purpose Guiding Construction

Whether the trial court was correct in its conclusion that the documents would be "useful only for the purpose of evading regulation" is immaterial under the FOIA. Indeed, the above-quoted conclusion of the trial court illustrates the basic error in sustaining the refusal of the FEA to produce the requested Guidelines. Although the District Court's conclusion, and the agency's

refusal to disclose its Guidelines for investigation, is a position with much common sense logic to commend it as a policy matter, the agency position is not sustainable under the FOIA.

The history, language, and structure of the Freedom of Information Act shows clearly that its purpose is that all Government documents must be disclosed on request, unless such documents fall within one of the nine enumerated exemptions from disclosure contained in the Act. "Disclosure, not secrecy, is the dominant objective of the Act." Accordingly, the exceptions particularized in the Act are "exclusive."[8] There is no requirement whatsoever that the seeker of information from Government files state the purpose of his obtaining the documents; the theory of the Act is that the public has a right to know and the procedures of the Act are to provide the enforcement mechanism, subject to the enumerated exemptions, which are to be narrowly construed.[9] Since no motive or purpose is required to be stated by the requester, it is immaterial what the requester's motive or purpose is, or to what extent or for what purpose the documents sought would be useful to the requester when he obtains them. This may be a serious flaw in the FOIA, but it is inherent in the purpose and structure of the Act, and has been recognized since its inception.[10]

**4.** See Brief of Appellee at 6–11.

**5.** Affidavit of James Newman, Deputy Assistant Administrator for Compliance, J.A. 35.

**6.** J.A. 12.

**7.** J.A. 44. The District Court held that the documents were not protected by Exemption 7, 5 U.S.C. § 552(b)(7), relating to investigatory records, but were in substantial part protected by Exemption 2. No appeal was taken from the ruling on Exemption 7 and this therefore is not before us. See Part IV, infra.

**8.** Department of Air Force v. Rose, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976); EPA v. Mink, 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); Montrose Chemical Corp. v. Train, 160 U.S.App.D.C. 270, 273, 491 F.2d 63, 66 (1974).

**9.** Department of Air Force v. Rose, supra, 425 U.S. at 361, 96 S.Ct. 1592; Vaughn v. Rosen (Vaughn II), 173 U.S.App.D.C. 187, 193, 523 F.2d 1136, 1142 (1975); Montrose Chemical Corp. v. Train, supra, 160 U.S.App.D.C. at 203, 491 F.2d at 66.

**10.** See, e. g., EPA v. Mink, 410 U.S. 73, 86, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973):

"[T]he Act, by its terms, [does not] permit inquiry into [the] particularized need of the individual seeking the information . . .."

In this regard, it is noted that the Act provides that each agency "shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3) (emphasis added). This statutory language supports the notion that the requesting party's purpose is irrelevant.

So when the trial court concluded that "the public may have an interest in the Guidelines, but it is not a legitimate interest," the trial court thus was evaluating the merits of the purpose or use to which the plaintiff would put the documents once he obtained them. Under the FOIA this is an erroneous approach, for the trial judge was in effect balancing the public's right to know against the public good to be obtained by permitting the Government agency to keep confidential its instructions for its audit agents. This balancing between the public interest in disclosure and Government confidentiality had already been done by Congress when it passed the Act. Those matters in the Government files in which the public's interest in maintaining confidentiality outweighs the public's right to know have already been the subject of a policy judgment made by Congress; they are enumerated in the nine exemptions to the Act, nowhere else.

It will not do to argue that the exemption should be broadly construed to protect the public interest, because we have been told (and we have said) precisely the contrary.[11] The Freedom of Information Act is to be viewed as a remedial statute and is to be construed liberally, and it is the exemptions that are to be construed narrowly. This, too, may not be ultimately in accord with the best interest of this country, but that is what the law says and the courts have largely followed it.

B. *Structure of Compelled Disclosure and Exemptions*

Turning to the structure of the Freedom of Information Act itself, the statute begins:

§ 552 Public information; agency rules, opinions, orders, records and proceedings.

(a) Each agency shall make available to the public information as follows:

There then are enumerated three categories or methods of making information available to the public. The first requires certain matter to be published in the Federal Register; the second requires certain matter to be made available for public inspection and copying; and the third requires certain matter to be available upon request to the agency.

The second method or category affirmatively requiring disclosure of certain matter under Section 552(a) states:

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

. . . . .

(C) administrative staff manuals and instructions to staff that affect a member of the public.

The third category is most pertinent here:

(3) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describe such records and (B) is made in accordance with published rules stating the time, place, fees (if any) and procedures to be followed, shall make the records promptly available to any person.

It has been argued by the FEA that the manuals issued to staff only here do not properly fall within Section 552(a)(2) because they are designed for internal use only; they guide the conduct only of staff personnel, and therefore do not "affect a member of the public." In the District Court plaintiff replied that no such staff manuals or instructions could affect a member of the public more than these do, because they determine what the auditors look for and what the auditors do in regard to the members of the public with whom they have contact.

The majority asserts that appellant's "first and principal contention" is that the Guidelines are "administrative staff manual[s]" required to be disclosed under 5 U.S.C. § 552(a)(2)(C). Actually, this argument seems to have been largely abandoned

11. *See EPA v. Mink,* 410 U.S. 73, 86, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). *See also* cases cited at notes 8, 9, *supra.*

by appellant. The District Court did not deal with this issue in its memorandum opinion. Appellant has not raised the issue on appeal, either in briefs or at oral argument.[12]

Indeed, appellant stated the issue on appeal as being solely the trial court's holding on Exemption 2. Thus, far from being appellant's "first and principal contention", from the time of the District Court's memorandum, the applicability of 5 U.S.C. § 552(a)(2)(C) simply no longer has been a significant issue in the case.

Whether these staff manuals and instructions fall under (a)(2) or not, it is clear that, if they do not, they do fall within the catch-all description of the third category, Section 552(a)(3), calling for records to be made available to the public on request, "reasonably describ[ing] such records . . in accordance with published rules," which no one denies that the plaintiff has done here.

The above is the affirmative part of the FOIA which unquestionably covers the request for disclosure made by plaintiff. Under the law, that request must be honored unless the matter sought falls within one of the nine exemptions, which are listed in Section 552(b), immediately following the affirmative disclosure requirements of subsection (a). The nondisclosure part of the FOIA provides:

  (b) This section does not apply to matters that are—

    .     .     .     .     .

  (2) related solely to the internal personnel rules and practices of an agency.

As my discussion of the purpose and structure of the Act above shows, it is on the wording of this exemption and this exemption only that the authority of the FEA to withhold the requested documents rests. If the Guidelines are not described by this specific language of the statute, they are not exempt and must be disclosed.

This conclusion rests on the specific language of the Supreme Court in *NLRB v. Sears, Roebuck & Company:*

> As the Act is structured, virtually every document generated by an agency is available to the public in one form or another, unless it falls within one of the Act's nine exemptions. . . . "[T]he disclosure obligation 'does not apply' to those documents described in the nine enumerated exempt categories listed in § 552(b)." [13]

## III. EXEMPTION 2 AS APPLIED TO THE FEA GUIDELINES SOUGHT

The FEA argues on three grounds that its "Refinery Audit Review Guidelines" and supplement "Guidelines for Audit Modules" were intended to be protected from disclosure by Exemption 2: First, the specific language of Exemption 2; second, the legislative history of Exemption 2; third, the balancing of the public interest in disclosure or nondisclosure of these Guidelines.

### A. *Specific Language of Exemption 2*

There are three key words in the short description of the matter specifically covered by this single exemption: The three key words are "solely," "internal," and "personnel."

"Internal," as modifying or limiting "personnel rules and practices of an agency," would seem to refer to those rules and practices which concern relations among the employees of that agency, as distinct from rules and practices which might relate to, or have an impact upon, members of the public. How an agency orders its own affairs among its own personnel would seem to invite little public interest in disclosure.[14] On the contrary, rules and practices which have a definite impact on the public would seem a fit subject for disclosure to the public. The first might properly be described as internal, the second as external. On

---

**12.** See Brief for Appellant at 8, 9, 11 and 15.

**13.** 421 U.S. 132, 136–37, 95 S.Ct. 1504, 1509, 44 L.Ed.2d 29 (1975).

**14.** See Supreme Court's comment in *Department of Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), quoted in text at note 27.

this basis the Guidelines should be more properly described as external rather than internal, although this is not a decisive division.

"Personnel" is the real problem for the Government agency here seeking to avoid disclosure. It is almost impossible to look at this short, simple exemption on its face, "related solely to the internal personnel rules and practices of an agency," and say that this description was intended to cover the Guidelines and instruction manuals here. "Personnel rules and practices" would normally have to do with rules such as pay, pensions, vacations, hours of work, lunch hours, parking, etc.—precisely the kind of trivia that was indeed described by the Senate's comment on the coverage of this particular exemption.[15] Just why the statute should go to the trouble to include a special subsection exempting this trivia is not certain.[16] But this is what the plain language of the statute points to, and it is confirmed by the Senate's comment, as will be seen below. An instruction manual of this guideline type is simply not a "personnel" rule or practice.

It is argued that the Guidelines are instructions limited to the personnel of this particular agency, and are thus personnel rules and practices. This argument is somewhat circular reasoning, however, because the question at issue here is whether these Guidelines can be limited to the knowledge of the personnel of the agency. Furthermore, it is apparent that if these Guidelines, instructions for agency personnel as to how they shall conduct themselves with the public to which their official duties relate, can be termed "personnel" rules and practices because they are directed to agency personnel, there is very little that the agency produces, except what it deliberately wants to make public, which could not be so limited.

The word "solely" emphasizes the limited scope of Exemption 2, whatever the other words are deciphered to mean.

It can only be concluded from the face of the statute that the Guidelines at issue here are not within the specific language of Exemption 2.

In an attempt to circumvent the plain meaning of Exemption 2, my two colleagues have come up with a novel reading of the provision. It is claimed that the phrases "internal personnel rules" and "practices of an agency" are to be read disjunctively, with the former phrase referring to relations between the agency and its employees and with the latter phrase referring to operational conduct of the employees. This interpretation cannot be sustained. It is violative of basic rules of English grammar, contrary to the legislative history of the exemption, and incompatible with the general purpose of the Act. Indeed, every court which has considered the specific language of Exemption 2 has concluded, for good and sufficient reasons, that the phrase "internal personnel" modifies both "rules" and "practices".[17]

Grammatically, it is clear that "internal" modifies "practices". "Internal" is an adjective which requires completion by the prepositional clause "of an agency". Whatever is modified by "internal" must be in-

**15.** See Part III.B, *infra*, at note 19.

**16.** The Supreme Court offered one explanation, see text at note 27, *infra*.

**17.** *Consumers Union of United States, Inc. v. Veterans Administration*, 301 F.Supp. 796, 800 (S.D.N.Y.1969) *appeal dismissed as moot*, 436 F.2d 1363 (2d Cir. 1971); *Benson v. General Services Administration*, 289 F.Supp. 590, 594 (W.D.Wash.1968), *aff'd on other grounds*, 415 F.2d 878 (9th Cir. 1969). See *Vaughn v. Rosen* (*Vaughn II*), 173 U.S.App.D.C. 187, 523 F.2d 1136 (1975); *Stokes v. Brennan*, 476 F.2d 699 (5th Cir. 1973); *Hawkes v. Internal Revenue Service*, 467 F.2d 787 (6th Cir. 1972); *Stern v. Richardson*, 367 F.Supp. 1316 (D.D.C.1973).

Cases which have given a broad interpretation to Exemption 2 have not set "practices of an agency" apart from "internal personnel rules". See *Tietze v. Richardson*, 342 F.Supp. 610 (S.D.Tex.1972); *Cuneo v. Laird*, 338 F.Supp. 504 (D.D.C.1972), *rev'd on other grounds, sub nom. Cuneo v. Schlesinger*, 157 U.S.App.D.C. 368, 484 F.2d 1086 (1973), *cert. denied, sub nom. Rosen v. Vaughn*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); *City of Concord v. Ambrose*, 333 F.Supp. 958 (N.D. Cal.1971).

ternal *to something*. "Internal" is orphaned unless it is related to the clause "of an agency". It is basic grammar that *both nouns* bracketed by the word "internal" and the phrase "of an agency" are modified by "internal". Moreover, while it is conceivable that "personnel" applies only to "rules", the preferred construction is that it modifies both nouns in the dyad "rules and practices". If Congress intended to sever "practices" from "internal personnel rules", it would have preserved parallel construction by inserting the article "the" before the word "practices".

We need not rely solely on the *rules* of grammar to determine that Congress had no intention of exempting a general category of information relating to "practices of an agency". It is clear from the legislative *history* of this particular clause, with direct reference to its grammatical construction, that Congress intended the exemption to be read as a composite clause, covering only internal personnel matters.

The phrasing of Exemption 2 is traceable to Congressional dissatisfaction with the exemption from disclosure under former Section 3 of the Administrative Procedures Act of "any matter relating solely to the *internal management* of an agency."[18] Agencies had relied on this broad language in refusing to disclose matters "rang[ing] from the important to the insignificant."[19] The language "internal personnel rules and practices" was first used in a bill specifically designed to *narrow* the "internal management" exemption in former Section 3 of the APA. S. 1666, introduced in the 88th Congress, proposed an exemption for "internal management" only in the subsection of the bill requiring certain matters to be published in the Federal Register. In the subsection requiring agency rules, orders and records to be made available for public in-

spection, an exemption was proposed only for information related "solely to the internal personnel rules and practices of an agency." This distinction was highlighted in the Senate Report on S. 1666 by reference to the latter as "more tightly drawn" language.[20] The Freedom of Information bills introduced in the 89th Congress, including S. 1160 which became the law in 1966, dropped the "internal management" exemption altogether and carried over the "more tightly drawn" language of S. 1666 as a single exemption. Thus, as the Supreme Court concluded in *Department of Air Force v. Rose*,[21] "the legislative history plainly evidences the Congressional conclusion that the wording of Exemption 2, 'internal personnel rules and practices', was to have a narrower reach than the Administrative Procedure Act exemption for 'internal management'". My colleagues' interpretation of Exemption 2 which sets apart "practices of an agency" as an independent category of exempt information would be contrary to Congress' clear intention that this exemption be interpreted specifically and narrowly.

Even more convincingly, it is clear from both the House and Senate hearings on Freedom of Information legislation in the 89th Congress that everyone concerned in both the legislative and executive branches understood that the words "internal personnel" applied to all of Exemption 2. For example, on the first day of House hearings on H.R. 5012, Congressman John E. Moss, Chairman of the Foreign Operations and Government Information Subcommittee of the House Government Operations Committee, Benny L. Kass, counsel to the subcommittee, and Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, discussed the scope of the phrase "internal personnel rules and practices":[22]

---

**18.** 5 U.S.C. § 1002 (1964). (emphasis added)

**19.** H.R.Rept. No. 1497, 89th Cong., 2d Sess., at 5 (1966), U.S.Code Cong. & Admin. News 1966, p. 2422.

**20.** S.Rept. No. 1219, 88th Cong., 2d Sess., 12 (1964).

**21.** 425 U.S. at 363, 96 S.Ct. at 1600 (1976).

**22.** Federal Public Records Law Part I: Hearings on H.R. 5012, et al., before the Foreign Operations and Government Information Subcomm. of the House Comm. on Government Operations, 89th Cong., 1st Sess., 29–30 (30 March–5 April 1965) (emphasis added).

Mr. Kass. Mr. Schlei, what is your interpretation of exemption No. 2? What information would fall under those records relating solely to the internal personnel rules and practices of an agency? How does your agency interpret that?

Mr. Schlei. Well, we were inclined to be critical of that exception because it did not seem to us actually that the personnel rules and practices of an agency, many of them, ought to be exempt. They ought to be public. How you handle various personnel problems and where somebody goes to complain if he is treated wrongly by his superior, and so on. All those things I would suppose should be public. They should be published somewhere. They should be up on a bulletin board.

And there are some personnel rules and practices that ought to be exempt, and I think that—let's see—

Mr. Kass. It is No. 2.

Mr. Schlei. And so that exception, it seemed to us, protected from disclosure things that did *not* need protection, as well as perhaps not going far enough as to some aspects of information that the Government gets about its employees.

Mr. Kass. Where an individual is, let's assume, fired from the agency—for cause we hope—would the facts and circumstances surrounding this discharge fall within the *personnel practices* of an agency as you read it?

Mr. Schlei. I should not think so, although you are talking here about records that are related to the "*practices*" of an agency, and conceivably a record, although it contained only a summary of some facts, say, might be related to the "*practices, personnel practices,*" of the agency, part of a file, part of a series of documents.

I am just talking off the top of my head about that problem, but I would say that you could get a situation where a factual statement or document came within that exception.

Mr. Kass. We are all talking, as you say, off the top of our heads. We are trying to create legislative history to determine what we intend.

Mr. Moss. *What this was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent.*

Mr. Schlei. *Ah! Then the word "personnel" should be stricken.* Because "personnel" I think connoted certainly to use the employee relations, employee management rules and practices of an agency. What you meant was material related solely to the internal rules and practices of any agency for the guidance of its employees—something like that.

I do agree that there should be protection for the instructions given to FBI agents and bank examiners; people who, if they are going to operate in expectable ways, cannot do their jobs. Their instructions have to be withheld.

But I think that word "personnel" does not do the job well enough, Mr. Chairman. I am sure it can be done.

Mr. Moss. We will hope to seek a way of doing the job without exempting internal rules and practices.

Mr. Schlei. I suppose that could cover quite a lot of ground, Mr. Chairman.

Mr. Moss. Because I am afraid that we would there open the barn door to everything.

Mr. Schlei. Well, it is one of those things, Mr. Chairman, that just shows how hard it is to cover the whole Government with a few words. There are a number of problems.

Mr. Moss. Oh, we recognize the difficulty and the complexity, but we are perfectly willing to work at it.

It is clear from this exchange that Congressman Moss, author of H.R. 5012, had intended the words "internal personnel" to apply to both "rules" and "practices". He apparently wanted investigative manuals covered by the exemption, *but he was told flatly that the word "personnel" precluded such interpretation.* He acknowledged this, but stated his concern that excising "personnel" would "open the barn door" by

leaving a broad exemption for all "internal rules and practices". The Senate was also told by several witnesses (at its hearings on the FOIA) that the proposed legislation did not protect investigative manuals and that if the Senate wanted to protect this material it would either have to expand Exemption 2,[23] Exemption 7,[24] or some other provision of the Act.[25] However, at no time did the Senate Committee or any individual Senator express a desire to cover investigative manuals and, accordingly, no change in the bill was made.

Finally, it is clear in reading Exemption 2 in the context of the Act as a whole that Congress intended to limit the word "practices" to "internal personnel" matters. The recognized purpose of the Act is to assure the broadest possible access to governmental records. Accordingly, the disclosure requirements are to be construed broadly, the exemptions narrowly. If the majority's reading of Exemption 2 were accepted, the Act would not apply to "matters that are related solely to the . . . practices of an agency." This would be an unlimited exemption, so broad that it would effectively swallow the rest of the Act. What *is not* an agency practice? What agency documents are there which *do not* relate to agency practices? And if one were to use the majority's constructional canon against superfluous language, one would ask why Congress has bothered to enumerate the other eight exemptions—"practices" covers it all.

In short, a survey of every intrinsic and extrinsic aid relevant to interpretation of Exemption 2 supports my reading of the provision's specific language. My colleagues' attempt to carve out a tenth ex-

emption for "practices of an agency" has nothing to recommend it but wishful thinking.[26]

### B. *Legislative History*

On the legislative history of this particular exemption, the Government agency is in an even weaker position than on its argument on the face of the statute, because the Supreme Court in *Department of Air Force et al. v. Rose, et al.*[27] and this court in *Vaughn v. Rosen (Vaughn II)*[28] have construed and discussed at length the legislative history of this exemption.

The perils of reliance on legislative history are nowhere better illustrated than with regard to Exemption 2, for rarely can there be found two such contradictory explanations of a statute's meaning than in the Senate and House Reports. The Senate Report on the Freedom of Information Act stated:

> Exemption 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.[29]

Diametrically opposite was the House Report:

> 2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions in routine admin-

---

**23.** Administrative Procedure Act: Hearings on S. 1160 et al., before the Subcomm. on Administrative Practices and Procedure of the Senate Comm. on the Judiciary, 89th Cong., 1st Sess. 34 (12, 14, 21 May 1965) (statement of Mr. Rains).

**24.** *Id.* at 112 (remarks by Mr. Benjamin).

**25.** *Id.* at 149 (statement of Professor Davis).

**26.** *Cf.*: This court's language in *Lubrizol Corp. v. EPA*, 183 U.S.App.D.C. 288, 299–300, 562 F.2d 807, 818–819 (1977) re an agency's at-

tempt to rewrite the statute by its regulations and this court's duty to resist such and thus place the issue squarely before Congress.

**27.** Note 8, *supra.*

**28.** Note 9, *supra.*

**29.** S.Rep. No. 813, 89th Cong., 2d Sess. 8 (1965).

istrative procedures which are withheld under the present law.[30]

Thus, the Senate Report interprets Exemption 2 as exempting only trivial "housekeeping" matters in which it can be presumed the public lacks any substantial interest. The language of the House Report however, "carries the potential of exempting a wide swath of information under the category of 'operating rules, guidelines and manuals of procedure.'"[31] As a threshold matter, it must be remembered that committee reports are not the law; they are only aids in interpreting statutory language and are useful only to the extent they fairly reflect Congressional intent.[32] Sometimes committee reports are not reliable guides to legislative intent as, for example, where they contain statements that contradict the plain meaning of the statutory language[33] or that conflict with the expressed purpose of the statute.[34]

We first confronted the amazing discrepancy between the Senate and House Reports to the Freedom of Information Act in *Vaughn v. Rosen (Vaughn II)*.[35] In that case we rejected the House Report as a reliable guide in construing Exemption 2 and chose to rely instead upon the Senate Report as being a truer indication of legislative intent. Every court which has *considered the difference* between the reports has done the same.[36]

In an attempt to validate the House interpretation of Exemption 2, and thus evade this court's decision in *Vaughn II*, the majority make the novel argument that there is no contradiction between the House and Senate Reports, and that both can be given effect. Every court and commentator dealing with this Exemption up until now has treated the two interpretations as contradictory.[37] And, of course, this is plainly so. Judge MacKinnon's opinion emphasizes the first half of the sentence from the House Report relating to operational rules, claiming that the House was here referring to something different from what the Senate had covered in its report, namely "practices" instead of "rules". I have already shown that this is a false distinction. Be that as it may, the contradiction is present in the second half of the House statement beginning with the words "but this exemption would not cover . . . ." This last part does not deal with anything the Senate overlooked; this last part deals with precisely those things the Senate mentioned, and puts a directly opposite interpretation on Exemption 2 as to whether routine internal management matters are covered or not. The Senate Report says they are; the House Report says they are not. What could be more contradictory? But the mere fact that the House Report directly contradicts the Senate Report is not the only basis for our determination in *Vaughn II* that "a court viewing the legislative history must be wary of relying upon the House Report."

In *Vaughn II* we expressed several reasons for preferring the Senate Report. First, we noted that the Senate Report language was more consistent with the actual wording of the statute, whereas the House Report appeared in several areas to depart

**30.** H.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), U.S.Code Cong. & Admin. News 1966, p. 2427.

**31.** *Vaughn v. Rosen (Vaughn II)*, 173 U.S.App. D.C. at 193, 523 F.2d at 1142.

**32.** *E. g., In re Evans*, 146 U.S.App.D.C. 310, 452 F.2d 1239, *cert. denied, sub nom. U. S. v. Evans*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1971).

**33.** *Id.* 146 U.S.App.D.C. at 316, 452 F.2d at 1245 ("[W]e would have difficulty accepting the report as, in effect, an amendment to the clear—and contrary—language of the statute."); *Abell v. Spencer*, 96 U.S.App.D.C. 268, 270, 225 F.2d 568, 570 (1955) ("One sentence in a Senate Report is not controlling where both houses of Congress have passed a bill containing unambiguous language to the contrary.")

**34.** *See United States v. General Motors*, 171 U.S.App.D.C. 27, 45, 518 F.2d 420, 438 (1975).

**35.** Note 9 *supra.*

**36.** *See* cases cited at note 17, *supra.*

**37.** *See* cases cited at note 17, *supra. See generally* K. Davis, *Administrative Law Treatise*, Chapter 3A (1970 Supp.).

from and indeed contradict the statutory language of the Act. This is an important factor in determining the relative reliability of committee reports.[38] Second, we observed that the House Report potentially exempted "a wide swath of information" but gave no guidance as to which matters are covered by the exemption and which are not, whereas the Senate Report provided a standard which agencies and courts could apply with certainty, consistency and clarity. The extent to which a committee report actually clarifies statutory language is also a relevant factor in determining its reliability, for reports are to be used to resolve ambiguities, not to create new ones.[39] Third, we noted that the sweeping interpretation of Exemption 2 favored by the House Report was incompatible with Congress' expressed intent to cut back on the previous exemption for "internal management." Fourth, we observed that the language of the House Report seemed less consonant with the overall scheme and general purpose of the Act than did the Senate Report: [40]

> Reinforcing this interpretation is "the clear legislative intent [of FOIA] to assure public access to all governmental records whose disclosure would not significantly harm specific governmental interests." As a result, we have repeatedly stated that "[t]he policy of the Act requires that the disclosure requirement be construed broadly, the exemptions narrowly." Thus, faced with a conflict in the legislative history, the recognized principal purpose of the FOIA requires us to choose that interpretation most favoring disclosure.

Finally, we addressed in *Vaughn II* what one commentator has called the "abuse of legislative history" which was involved in adoption of the House Report.[41] This refers to the fact that the expansive gloss placed on Exemption 2 and other sections of the Act by the House Report was the product of last minute chicanery by interested members of the House *after* the Senate had passed the bill and just as the full Committee in the House was about to report out the bill. The details of this episode have been placed on the public record by Benny L. Kass, who was counsel to the Foreign Operations and Government Operations Committee from 1962 to 1965, and who was later assistant counsel to the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee. Testifying in 1973 at Senate hearings on proposed amendments to the Freedom of Information Act, Mr. Kass explained "why the House report is so different from the rest of the bill":[42]

> The basic reason that the House bill is different was after the Senate passed the Freedom of Information Act and it was about to be reported out of the House Government Operations Committee, the Justice Department—Mr. Katzenbach, Mr. Wozencraft—*came up and talked to Congressman Moss and said, look, we cannot support the bill. There are a number of changes that have to be made.*
>
> I kind of appeared as an emissary on behalf of the former chairman of this subcommittee to Congressman Moss and I said it is our reading from the Senate

38. *See Montgomery Charter Service, Inc. v. Washington Metropolitan Area Transit Co.*, 117 U.S.App.D.C. 34, 325 F.2d 230 (1963); *Peoples Natural Gas Co. v. FPC*, 75 U.S.App.D.C. 235, 127 F.2d 153, *cert. denied*, 316 U.S. 700, 62 S.Ct. 1298, 86 L.Ed. 1769 (1942); *Hoover v. Intercity Radio Co.*, 52 App.D.C. 339, 286 F. 1003 (1923).

39. *E. g., FTC v. Manager, Retail Credit Co.*, 169 U.S.App.D.C. 271, 278, 515 F.2d 988, 995 (1975) ("The proper function of legislative history is to resolve ambiguity, not to create it.") (MacKinnon, J.).

40. 173 U.S.App.D.C. at 193, 523 F.2d at 1142.

41. *See generally*, K. Davis, Administrative Law Treatise, § 3A.31 (1970 Supp.) at 174–76.

42. Freedom of Information, Executive Privilege, Secrecy in Government: Hearings on S. 1142 et al. before the Subcomm. on Administrative Practice and Procedure and the Subcomm. on Separation of Powers of the Senate Comm. on Judiciary and the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations, (Volume 2), 93rd Congress, 1st Sess., 122–6 (7, 8, 11, 26 June 1973) (testimony of Benny L. Kass).

that the *Senate has already passed this bill twice, that there should be no amendments.* We wanted to move forward with it. We have played with it long enough.

So basically what was done under really almost an implied veto—I don't think they ever specifically said they would veto it but there was an implied threat—*we tried to compromise a number of the specific objections into the House report.* I don't think time permits going into these details. I have a very brief analysis which I was going to submit. I have to type it and I will submit it for the record, pointing out where the *House kind of gave in to what the Justice Department wanted.* (emphasis added).

Mr. Kass then pointed out eight sections in the House Report in which the Justice Department was able to get the language it wanted. Not surprisingly, the seventh area was the Report's description of Exemption 2. Mr. Kass concluded: [43]

I don't think it was a sellout but in any event it was really the price of getting the bill. It was my legal advice to both the chairman of this committee and the chairman, Congressman Moss, that *the legislative history only interprets and does not vitiate in any way the legislation and that the legislation was strong and was there.*

I think this is important just for the record to point out why the House report is different. Fortunately, as Mr. Dobrovir said, there have been a number of cases all of which have said that the House report is so different that we have to look to the statute and that *the House report should not in any way undermine the basic statute that was passed by Congress in 1966.* (Emphasis added.)

This background is relevant to the weight that the House Report should be accorded as an item of legislative history. Statements in the report of a single House are

not reliable guides to Congressional intent where, as here, they have been inserted in an effort to *change* the meaning of the statutory language already adopted by the House which initiated the legislation. As Professor Davis said: [44]

The basic principle is quite elementary: The content of the law must depend upon the intent of both Houses, not of just one. In this instance, only the bill, not the House committee's statements at variance with the bill, reflects the intent of both Houses. *Indeed, no one will ever know whether the Senate Committee or the Senate would have concurred in the restrictions written into the House committee report.*

\* \* \* \* \* \*

The reasons why the courts will reject the House committee's abuse of legislative history, even though the Attorney General supports it, are overwhelming. Allowing the meaning of clear statutory words to be drastically changed by the House committee report would have many unsound consequences. Three major ones are: (1) The House that acts first would be deprived of any voice in the final meaning of the enactment, for the House that acts second could always adopt the same bill but alter its meaning through committee reports. (2) The sound system of the conference committee would be defeated, for the House that acts second, even when it knows the other House disagrees, could always make law as it chooses through the committee reports. (3) Statutes which are clear on their face would become unreliable indicia of the effective law.

The position of this Court in *Vaughn II* has recently been vindicated by the action of the House of Representatives itself in passing the "Government in the Sunshine Act of 1976." [45] Professor Davis has recently suggested the relevance of the Sunshine

**43.** *Id.* at 126.

**44.** K. Davis, Administrative Law Treatise, § 3A.31 (1970 Supp.) at 175–76.

**45.** P.L. 94–409, 90 Stat. 1241.

Act to interpretation of the Freedom of Information Act: [46]

> The Freedom of Information Act, Advisory Committee Act, Privacy Act, and Government in the Sunshine Act all deal with the subject matter of openness of records and of meetings. Each of the four statutes has its own function. Each provision of each statute may be interrelated to one or more provisions of the other statutes. Furthermore, the various statutes often use language that is identical with the language of another statute. The meaning of that language may depend not only on legislative history and interpretations with respect to the language of the one statute, but it may depend upon legislative history and interpretations with respect to the identical language that is used in one of the other statutes.

Of course, Professor Davis is correct, for it is a well established principle that courts may look to subsequent legislation as an aid in the interpretation of prior legislation dealing with the same or similar subject matter.[47] Indeed, Chief Justice Marshall stated the principle that, if it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, this will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.[48]

Applying this principle, it is highly significant that the Government in the Sunshine Act, enacted in 1976, carries over verbatim most of the exemptions in the Freedom of Information Act, including the specific language of Exemption 2. Thus, 5 U.S.C. § 552b(c)(2) exempts from the Act's open meeting requirement portions of meetings likely to "relate solely to the internal personnel rules and practices of an agency." *The House Report to the Sunshine Act gives the same narrow interpretation to this exemption as the Senate did in 1965:* [49]

> (2) This exemption includes meetings relating solely to an agency's internal personnel rules and practices. It is intended to protect the privacy of staff members and to cover the handling of strictly internal matters. *It does not include discussions or information dealing with agency policies governing employees' dealings with the public, such as manuals or directives setting forth job functions or procedures.* As is the case with all of the exemptions, a closing or withholding permitted by this paragraph should not be made if the public interest requires otherwise. (emphasis added).

It thus appears that by 1976 the House of Representatives had repudiated the sweeping language concerning Exemption 2 contained in its 1966 report on the Freedom of Information, thus leaving my colleagues out of date on the House's own interpretation. Chief Justice Marshall would thus have repudiated Judge MacKinnon's position.

This Court's rejection of the House Report has recently been vindicated by the Supreme Court. Five months after our decision in *Vaughn II,* the Supreme Court in

---

**46.** K. Davis, Administrative Law in the Seventies, § 3A.00–1 (Cumulative Supp.1977) at 23.

**47.** *E. g., W. A. Sheaffer Pen Co. v. Lucas,* 59 App.D.C. 323, 41 F.2d 117 (1930); *Apfel v. Mellon,* 59 App.D.C. 94, 33 F.2d 805, *cert. denied,* 280 U.S. 585, 50 S.Ct. 35, 74 L.Ed. 634 (1929); *Joy Floral Co. v. C.I.R.,* 58 App.D.C. 277, 29 F.2d 865 (1929). See *District of Columbia v. Orleans,* 132 U.S.App.D.C. 139, 406 F.2d 957 (1968).

**48.** "It is to be observed that acts in pari materia are to be construed together as forming one act. If, in a subsequent clause of the same act, provisions are introduced, which show the sense in which the Legislature employed doubtful phrases previously used, that sense is to be adopted in construing those phrases. Consequently, if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law." Chief Justice Marshall, in *Alexander v. Alexandria,* 5 Cranch 7, 3 L.Ed. 19.

**49.** H.R. Rept. No. 94–880 (Part I), 94th Cong., 2d Sess., at 9 (1976), U.S.Code Cong. & Admin. News 1976, p. 2191.

*Department of Air Force, et al. v. Rose* [50] specifically considered the legislative history of Exemption 2, quoted at some length from our opinion in *Vaughn II,* and approved our reasoning therein, and likewise concluded, "[A]nd because we think the primary focus of the House Report was on exemption of disclosures that might enable the regulated to circumvent agency regulation, we, too, 'choose to rely upon the Senate Report' in this regard." [51]

In concluding its discussion of Exemption 2, the Supreme Court stated: "In sum, we think that, at least where the situation is not one where disclosure may risk circumvention of agency regulation, Exemption 2 is not applicable to matters subject to such a genuine and significant public interest. . . . Rather, the general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest." [52]

From the words "at least where the situation is not one where disclosure may risk circumvention of agency regulation," the FEA argues that the Supreme Court implied that Exemption 2 should be stretched to cover such a situation. I cannot agree; this language of the Supreme Court means no more than that the Court cautiously left open the question of what to do about any exemption "where disclosure may risk circumvention of agency regulation." With the question left open, we have confronted the problem here, and, as my analysis of the statutory language of Exemption 2 and its legislative history demonstrates, Exemption 2 was not designed to protect documents whose disclosure might risk circumvention of agency regulation, whatever would be the merits of such a provision. Exemption 2 is much more limited, as I have described. And, it is evident from the reasoning of the Supreme Court in adopting the meaning of

Exemption 2 as described in the Senate Report, and in the Supreme Court's citation with approval of our reasoning in *Vaughn II,* that a stretching of Exemption 2 to protect the Guidelines would be inconsistent with the Supreme Court's reasoning in *Rose* and our court's analysis in *Vaughn II.*

## C. Balancing of the Public Interest in Protecting These Guidelines Against Disclosure

The Government agency urges that this Court should balance the public interest in protecting these particular Guidelines against disclosure versus any legitimate interest these plaintiffs or other members of the public may have in utilizing these Guidelines. This is an exhortation to balance disclosure of the individual documents involved in this particular case against the public interest in confidentiality. This the Court cannot do. The Freedom of Information Act certainly does not permit a court to balance the public good or harm involved in a disclosure or confidential retention of any individual document. The balancing of the public interest in disclosure or nondisclosure has been done by Congress, as discussed above. And it was done by Congress in terms of *categories* of documents which were to be exempt from disclosure. All of the cases which to my knowledge have touched on this question, beginning with our own decision in *Soucie v. David,* [53] have discussed the balancing of the public interest in terms of categories of documents, not in terms of the individual documents concerned. [54]

On reflection, it becomes clear that for a court to balance the public interest in disclosure or nondisclosure, with reference to the particular documents involved in a case, would destroy completely the effectiveness of the Freedom of Information Act. This procedure was what occurred before the passage of the Act in 1966. The whole

50. Note 8, *supra.*

51. *Id.,* 425 U.S. at 366–67, 96 S.Ct. at 1601.

52. *Id.* at 369–70, 96 S.Ct. at 1603.

53. 145 U.S.App.D.C. 144, 153–154, 448 F.2d 1067, 1076–77 (1971).

54. *E. g. Ditlow v. Brinegar,* 161 U.S.App.D.C. 154, 494 F.2d 1073 (1974) (Exemption 7).

scheme of the Act, as analyzed above, is to decree: first, in Section 552(a) the particular methods by which all records are to be made available to the public, whether (1) published in the Federal Register, or (2) made available for inspection and copying, or (3) to be made available upon request; second, following the mandate of disclosure, in Section 552(b) are listed the nine specific enumerated exemptions.[55]

*The whole question of whether any Governmental document should be disclosed or protected against disclosure is a matter of public policy for legislative determination in the first instance.*[56] There is no constitutional question involved here on which a court might feel free to express itself. The whole question of what is to be disclosed is one on which the Congress has spoken in precise, enumerated detail. If Congress has erred, Congress has erred, and it is not for this or any other court to rewrite a statute, in which we might consider to have been omitted necessary items in a list of exemptions against disclosure. On the face of the statute, on its legislative history, the Guidelines here at issue do not fall within the specific language of Exemption 2. This Court cannot write in an exemption to protect these Guidelines without rewriting the statute.[57] Rewriting, especially to add a separate and distinct item to a carefully limited list, is for Congress.

One can easily see the public interest to be served by keeping confidential these Guidelines designed, as plaintiff contends,

to prevent FEA auditors from exceeding their instructions and authority, and from unduly harassing the business enterprises inspected, for if revealed no doubt they will serve as useful guidelines somewhere for those bent on evasion of the law by concealing accounting data in those areas in which the auditors are instructed not to look or to look lightly. Furthermore, these FEA Guidelines for its auditors are but examples of similar instructions found in many other Government agencies, and their revelation to the public must be accompanied by a diminution in the effectiveness of law enforcement. It may be thought strange that Congress did not provide for their exemption from disclosure; certain it is that Congress did not protect such Guidelines by Exemption 2.[58]

## IV. THE MAJORITY'S IMPROPER RELIANCE ON EXEMPTIONS 7 AND 5

The majority supports its interpretation of Exemption 2 by reference to Exemption 7, concluding "We thus refuse to interpret Exemption 2 as requiring the disclosure of matter that it is the objective of Exemption 7 to protect." However, Exemption 7 was *not* designed to protect the Guidelines in question. That exemption applies only to "investigatory records." A document is an "investigatory record" if its purpose for creation was part of an agency inquiry into *specific* conduct which might be found to have violated a statute or regulation admin-

---

**55.** *NLRB v. Sears, Roebuck,* text at note 12, supra.

**56.** Aside from any constitutional question, reserved for judicial decision.

**57.** *Soucie v. David,* 145 U.S.App.D.C. 144, 153–154, 448 F.2d 1067, 1076–77 (1971).

**58.** The disclosure of these Guidelines would be especially regrettable because the FEA and other agencies have spent a great deal of effort in compiling guidelines for their investigators, not only to increase the efficient use of their time, but also to prevent dangerous freelancing and extemporizing by agents, to give them common directives within recognized legal limits. Agencies would instinctively tend to eliminate written guidelines which they would be obliged to disclose, to direct their operatives by word

of mouth, variations in procedure would set in, agents would exceed reasonable limits, all to the public harm.

Such harm could be prevented, however, by an exemption in the Freedom of Information Act forbidding the disclosure of such guidelines prescribing rules for auditors or investigators. As the dialogue between Congressman Moss and Assistent Attorney General Schlei showed (p. ——— of 192 U.S.App.D.C., p. 743 of 591 F.2d, *supra*), some members of the House wanted such an exemption, but they were told that the language of Exemption 2 did not cover this, and the parliamentary situation (the Senate having already passed the FOIA) prevented any change in the text of the bill which was subsequently enacted.

istered by that agency.[59] The Guidelines here are clearly not such records, and the District Court properly so held. No appeal has been taken by the Government from this ruling.

The majority argues further that because Exemption 7 protects against disclosure of investigatory records which would reveal investigatory techniques and procedures, this court should construe Exemption 2 expansively to protect against disclosure of other kinds of information besides investigatory records which could likewise reveal such techniques and procedures. This argument might be appropriate if the language of Exemption 2 and its legislative history admitted of such an expansive interpretation. However, as I have demonstrated above, such a construction would amount to blatant judicial legislation. Section 552(c) provides that the Act cannot be invoked as a basis for withholding information "except as specifically stated" in one of the nine exemptions. The narrowness of the phrase, "specifically stated," forbids the expansion of the exemptions beyond their terms both by the agencies *and by the courts*. Although I would agree that Congress *should* have written in an exemption covering the documents here sought, it is my firm belief that Congress did not, and therefore I cannot accept a spurious construction of an exemption in order to cover the documents.

Astonishingly, as an "additional basis" for its holding, the majority finds that the Guidelines in question are exempt from disclosure as "intra-agency memoranda" under Exemption 5. However, the only exemptions asserted by the Government as grounds for withholding the Guidelines have been Exemptions 2 and 7. The District Court held Exemption 7 inapplicable, and, having taken no appeal from this rul-

ing, the Government has relied solely on Exemption 2 before this court.[60] At no time has the Government raised Exemption 5 as a ground for withholding the Guidelines. It was not raised in the Agency's initial denial; it was not raised in the Government's pleadings in the District Court. In its motion for summary judgment and supporting affidavit in the District Court, the Government neither asserted Exemption 5 nor provided any factual basis for concluding that it applied. It was not mentioned in the District Court's opinion, nor was it raised in any way by the Government on this appeal, either in its briefs or at oral argument.

It is basic that the FOIA establishes a statutory presumption that all federal records are available to "any person." The presumption is rebutted only by evidence presented by an agency that the item sought is exempt from disclosure under one of the nine enumerated exemptions. The agency bears the full burden of proof when an exemption is claimed to apply.[61] To meet this burden the agency must specifically identify the exemption relied upon and demonstrate that the exemption applies to the documents in question. *If an agency neither asserts an exemption nor adduces evidence demonstrating its applicability, a court may not step in sua sponte on behalf of the Government` and assert as grounds for withholding information from disclosure an exemption which the Government itself has not asserted.*[62]

This principle derives not only from the basic requirements of the FOIA itself, but also from the fundamental precept that issues on appeal are to be confined to those duly presented to the trial court—a precept which Judge MacKinnon recalled and applied recently in *Doe v. McMillan*.[63] This

---

59. *See Rural Housing Alliance v. U. S. Dept. of Agriculture,* 162 U.S.App.D.C. 122, 498 F.2d 73 (1974).

60. *See* Brief for Appellee at 4, 17–21.

61. *See* 5 U.S.C. 552(a)(4)(B).

62. *Cf. Vaughn v. Rosen (Vaughn II),* 173 U.S. App.D.C. at 194, 523 F.2d at 1143 (Court of

Appeals would not consider rationale for applying exemption not raised in District Court).

63. 148 U.S.App.D.C. 280, 287, 459 F.2d 1304, 1311 n.10 (1972), *rev'd on other grounds,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). *See also Miller v. Avirom,* 127 U.S.App.D.C. 367, 384 F.2d 319 (1968); *Calhoun v. Freeman,* 114 U.S.App.D.C. 385, 316 F.2d 386 (1963);

principle reflects, in part, due process considerations, for if the Government does not raise a particular exemption as a defense in the district court or on appeal, the appellant will have no opportunity to present arguments or evidence against the applicability of the exemption. Thus, in view of the fact that in this case the Government has at no time asserted or presented evidence on the applicability of Exemption 5, the majority's resort to the exemption is gratuitous and improper.

Furthermore, even if the argument for applying Exemption 5 to the Guidelines is considered on its merits, there is clearly no basis for holding Exemption 5 applicable. The basic purpose for Exemption 5 is to exempt from disclosure the predecisional, deliberative internal communications of an agency in order to protect its decisional processes. An agency asserting this exemption must show that disclosure of the memoranda sought would harm one of several policies: (1) the policy to protect creative debate and discussion within an agency,[64] (2) the policy to avoid misleading the public as to the grounds for a particular agency action or to avoid premature publication of novel and unadopted concepts under consideration,[65] and (3) the policy to protect the integrity of the decision-making process.[66] The Guidelines sought in this case are not pre-decisional documents. They discuss and instruct agency personnel concerning decisions already made and policies already set. The Government has adduced no evidence whatsoever that disclosure of the Guidelines would have a "chilling effect" on creative discussion within the FEA, precipitously disclose novel and unadopted concepts still under consideration, or interfere with the decision-making process in the FEA. Thus,

there is no basis for applying Exemption 5 in the instant case.[67]

The position taken by the majority here regarding Exemptions 7 and 5 is based on claims not asserted by the Government. If this litigation progresses farther, either to an *en banc* in this court or to the Supreme Court, I strongly suggest that it is incumbent upon the Government to advise the court in its first papers filed whether it will now attempt to rely upon either Exemption 7 or 5, and if so, to justify such reliance.

Before BAZELON, Chief Judge and WRIGHT, McGOWAN, TAMM, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

---

American Lease Plans, Inc. v. Houghton Const. Co., Inc., 492 F.2d 34 (5th Cir. 1974).

**64.** See International Paper Co. v. FPC, 438 F.2d 1349 (2nd Cir. 1971); Tax Reform Research Group v. IRS, 419 F.Supp. 415 (D.C.D.C.1976).

**65.** See Renegotiation Bd. v. Grumman Aircraft Eng. Corp., 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975).

**66.** See Sterling Drug, Inc. v. FTC, 146 U.S.App. D.C. 237, 450 F.2d 698 (1971).

**67.** See Merrill v. Federal Open Market Committee of Federal Reserve System, 184 U.S.App. D.C. 259, 565 F.2d 778 (1977).