**Glen L. ROBERTS, Plaintiff,**

v.

**INTERNAL REVENUE SERVICE, and Roscoe Egger, Commissioner of Internal Revenue, Defendants.**

**Civ. A. No. 83CV–6298–AA.**

United States District Court, E.D. Michigan, S.D.

April 23, 1984.

David H. Raaflaub, Ann Arbor, Mich., for plaintiff.

L. Michael Wicks, Asst. U.S. Atty., Detroit, Mich., Michael J. Kearns, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM OPINION
AND ORDER

JOINER, District Judge.

This is an action brought under the Freedom of Information Act, 5 U.S.C. § 552. Plaintiff seeks an order from this Court

---

directing the Internal Revenue Service to disclose a copy of its Law Enforcement Manual (LEM). Defendants have brought a motion for summary judgment, arguing that the documents at issue are protected from disclosure under section 552(a)(2)(C) of the FOIA because they are materials relating to law enforcement. For the reasons stated herein, the motion is granted, and the complaint is dismissed with prejudice.

1. Affidavits of the following officials were submitted in connection with the government's motion:

(A) An attorney in the Disclosure Litigation Division of the Office of Chief Counsel of the Internal Revenue Service, who described the broad outline of the Internal Revenue Manual and Law Enforcement Manual, and the process whereby law enforcement provisions were segregated from those provisions that could be disclosed to the public;

(B) Assistant Commissioner of Examination, who described the function of his division, which includes the auditing of tax returns filed by all taxpayers, and the identification of noncompliance with the federal tax laws, and who further described those portions of the LEM, particularly LEM IV–190, which were pertinent to the work of the Examination Division;

(C) Assistant Commissioner of Criminal Investigation, who described the criteria used by officials in that division in their determinations of whether or not to recommend criminal prosecution of particular instances of noncompliance with the tax laws, and the features of Part IX of the LEM, which guides the operations of that division;

(D) Assistant Commissioner of Employee Plans and Exempt Organizations, who described the criteria employed by officials in that division in fulfilling their mission to protect the interests of employee plan beneficiaries and assuring that exempt organizations continue to meet the statutory requirements for exemption, and further described the features of Part VII and of the LEM, which is of controlling significance to that division;

(E) Director of the Appeals Division of the Internal Revenue Service, who identifies the mission of that division as the resolution of tax controversies between the I.R.S. and taxpayers without litigation, in a manner which is fair and impartial to the government and the taxpayer, and who described the features of Chapters 200, 800, and (24)00 of the LEM, which guides the operations of that division;

(F) Assistant Commissioner for Planning, Finance and Research, an administrative arm of the I.R.S., which is responsible for development of the I.R.S. budget, managing appropri-

## DISCUSSION

■ Pursuant to Fed.R.Civ.P. 56(b), defendants have submitted 10 affidavits, propounded by various officials in the Internal Revenue Service,[1] which officials have administrative responsibilities defined by or connected with the LEM. The affidavits of these officials, the substance of which are uncontroverted by plaintiff,[2] set forth in detail the scope and purposes of the LEM.

ated funds, and accounting for their use. He described the features of Part I of the LEM, which guides that division;

(G) Assistant Commissioner for Collection, who describes the enforcement criteria and tolerances contained in various chapters of Part V of the LEM that pertain to the collection function;

(H) Director of the Disclosure and Security Division, who describes the security program that protects the Integrated Data Retrieval System (IDRS) and those portions of Part I of the LEM which are identified as the IDRS Security Handbook;

(I) Acting Assistant Commissioner for Computing Services, who describes his principal duties as the development and evaluation of computer systems, programs and hardware and software requirements. He further describes the operation of the Discriminant Function System (DIF), which assigns scores to various types of returns that merit greater scrutiny by examiners, and the features of the Automatic Data Processing (ADP) handbooks, which contain procedures for the utilization of the I.R.S. computer systems;

(J) Assistant Commissioner for Returns and Information Processing, who appears to be the chief accounting officer for the I.R.S., and who describes the features of selected portions of Part III of the LEM and ADP III, which guide the operation of that division.

2. Plaintiff, in his response to this motion, does not attempt to controvert any of the factual representations set forth in the government's affidavits. Rather, he argues that there continue to remain material questions of fact in this case, although he does not identify which facts remain in controversy. Further, he has failed to produce any admissible evidence, by way of affidavit or otherwise, in support of his contention. Consequently, he has failed to satisfy the requirement of Fed.R.Civ.P. 56(e) that

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing there is a genuine issue for trial.

It is from these affidavits, which the Court has thoroughly reviewed, that the Court draws its findings of fact concerning the nature of the LEM.

The I.R.S. has developed certain procedures which guide the operations of its personnel. These procedures are memorialized in a 42,000 page manual (The Internal Revenue Manual). All of these procedures, except for a limited portion that the I.R.S. has classified as "Official Use Only", are publicly available throughout the country in Freedom of Information Act Reading Rooms. The "Official Use Only" instructions, which comprise some 18,000 of the 42,000 pages of the Internal Revenue Manual, is designated as the LEM. The LEM can be bifurcated into two sections. By far the larger portion (some 17,500 pages) contain sensitive Automatic Data Processing (ADP) information. This information contains procedures for computer processing of tax returns, including, for example, information relating to the computation of the Discriminant Function System (DIF), which assigns scores to various types of returns that require more careful scrutiny by examiners; command codes that are used in processing and maintaining information in the I.R.S. master files; and procedures describing how to access and manipulate the IDRS data base. The remaining 500 pages of the LEM contain what the affiants variously described as:

criteria, guidelines, procedures and tolerances, which include but are not limited to the following examples: time limits that are used by the Service to determine when a later payment of tax liability will be accepted as timely; a range or a specific dollar amount above or below which a deduction taken on a taxpayer's return will trigger the return to be selected for examination; a specific dollar amount that is applied to a particular deduction on a return to determine whether other deductions on the return warrant closer scrutiny by an examining agent.

The purpose of the LEM can be succinctly stated as follows: because the I.R.S.

See *Granger v. Marek*, 583 F.2d 781 (6th Cir.

does not have the resources to effectively monitor every return filed to insure voluntary compliance with the federal income tax laws, it has developed certain guidelines which enable it to scrutinize those returns most likely to reveal noncompliance. The guidelines focus upon a variety of characteristics of a given return which have a positive correlation with income tax evasion.

## THE APPLICABLE LAW

Although plaintiff fails to identify the particular provision of the Freedom of Information Act which requires disclosure of these materials, the only conceivable source of authority is 5 U.S.C. § 552(a)(2)(C), which provides as follows:

Each agency, in accordance with published rules, shall make available for public inspection and copying

.    .    .    .    .

(C) *administrative* staff manuals and instructions to staff that affect a member of the public (emphasis added).

The Court of Appeals for the Sixth Circuit has concluded that law enforcement materials are not subject to disclosure under subsection (a)(2)(C), *Hawkes v. Internal Revenue Service*, 467 F.2d 787 (6th Cir.1972). The *Hawkes* court set forth the controlling standard in this Circuit for determining what kind of staff manuals constitute law enforcement materials as follows:

Law enforcement is the process by which a society secures compliance with its duly adopted rules. Enforcement is adversely affected *only* when information is made available which allows persons simultaneously to violate the law and to avoid detection. Information which merely enables an individual to conform his actions to an agency's understanding of the law applied by that agency does not impede law enforcement and is not excluded from compulsory disclosure under (a)(2)(C).

Far from impeding the goals of law enforcement, in fact, the disclosure of

1978).

information clarifying an agency's substantive or procedural law serves the very goals of enforcement by encouraging knowledgeable and voluntary compliance with the law. Such clarifying information is found in agency rulings made public; it is also found in many cases in manuals and instructions like those sought here which are addressed specifically to agency personnel. It may be found in the criteria for investigative action; in standards for evaluation and so forth. Materials providing such information are administrative in character and clearly discloseable under (a)(2)(C).

The exception for law enforcement materials contained in (a)(2)(C) is, as suggested above, a very narrow one and is to be applied only where the sole effect of disclosure would be to enable law violators to escape detection. Thus, for example, there is reason to exempt from compulsory revelation details of a selective enforcement policy made necessary by a lack of sufficient investigatory personnel. Similarly interogation techniques or the mechanics of an F.B.I. "stakeout" arrangement properly could be excluded from disclosure under (a)(2)(C).

Again, it must be emphasized that the exception to (a)(2)(C) disclosure is a narrow one, over-extension of which is as likely to thwart the overall goals of law enforcement as would its total disregard. Given these facts and the clear policy of the Information Act, doubts as to the meaning of this subsection should be resolved in favor of disclosure.

*Id.* at 795–96 (citation omitted).

The *Hawkes* court found that the law enforcement materials exception to the disclosure requirement of subsection (a)(2)(C) arose implicitly from the use of the adjective "administrative" in that provision, and from a review of the legislative history of the FOIA.[3] As the *Hawkes* court stressed,

the exception is "a very narrow one and is to be applied only where the sole effect of disclosure would be to enable law violators to escape detection."

To the same effect is *Cuneo v. Schlesinger,* 484 F.2d 1086 (D.C.Cir.1973), *cert. denied sub nom., Rosen v. Vaughn,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). *Cuneo* involved the non-public portions of a Defense Contract Audit Manual which set forth the selective spot-check procedures used by Department of Defense auditors of DOD contracts. The confidential portions of the manual prescribed what was to be audited, how audits would be conducted, and the reliance to be placed on the internal controls of the contractors. Although the *Cuneo* court remanded the case so that the government could attempt to justify its contention that the manual was entitled to the law enforcement exception to disclosure under § 552(a)(2)(C), the same court subsequently read *Cuneo* to establish that, to the extent that the government sought to conceal its "game plan for the audit and investigation of contractors," that game plan was exempt from disclosure, *Ginsburg, Feldman & Bress v. Federal Energy Administration,* 591 F.2d 717, 721 (D.C. Cir.) *aff'd on rehearing* 591 F.2d 752 (1978) *cert. denied* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979). *See generally,* 1 Davis, *Administrative Law Treatise,* 2d Ed. § 5:15 (1978).

There is a tension inherent in the government's argument that the LEM should not be subject to disclosure under subsection (a)(2)(C). Persons in the position of plaintiff can make the reasonable argument that they are entitled to take every permissible advantage provided by the Internal Revenue Code to minimize tax liability. In other words, they are entitled to come as close as possible to violating the tax laws without actually violating them. They further argue that disclosure of government guide-

---

**3.** *See* Sen.Rep. No. 813, 89th Cong., 1st Sess. (1965); H.R.Rep. No. 1497, 89th Cong., 2d Sess. The *Hawkes* court determined that the House Report's comment on subsection (a)(2)(C) provided too broad an exception from the disclo-

sure requirements for law enforcement materials, and drew its own conclusions about the proper boundaries of the exception from the Senate Report, *Hawkes, supra* at 794.

lines for selecting particular returns for audit, and for proceeding against certain taxpayers who have violated the tax laws, but not against others, will enable taxpayers to make their conduct conform to the interpretation of the Internal Revenue Code rendered by the I.R.S.

Such an argument is misplaced, however. The I.R.S. points out that, because of its limited resources, it is unable to detect and proceed against every taxpayer who violates the tax laws. Certain violators who overstep the boundaries of strict compliance, but only by a nominal degree, will not be caught because the holes in the enforcement net of the I.R.S. are large enough to allow these small fish to pass through. Further, among all those whose noncompliance has been discovered, not all will be the subject of enforcement action, because again the I.R.S. does not have the resources to proceed against every known transgressor.

One of the tools in the arsenal of the I.R.S. which promotes voluntary compliance is the uncertainty in the minds of the taxpayers as to just how much overstepping of the boundaries of strict compliance will bring down the enforcement authority of the agency. The government argues that, by disclosing the guidelines by which it determines which violations are so egregious as to merit enforcement action, it will permit the taxpayer bent on unlawful tax avoidance to conform his conduct not only to the boundary between strict compliance and noncompliance, but also to the boundary between noncompliance which does not merit enforcement action by the I.R.S., and noncompliance which is so egregious as to prompt the agency to respond. In other words, in the words of the *Hawkes* opinion, "the sole effect of disclosure (of these materials) would be to enable law violators to escape detection."

The court concludes that the material contained in the LEM is the kind of sensitive law enforcement information, disclosure of which will only serve to undermine law enforcement. As such, it is protected against disclosure by the law en-

forcement materials exception to 5 U.S.C. § 552(a)(2)(C). Accordingly, defendant's motion for summary judgment is granted.

SO ORDERED.